**Jenny Lisette FLORES, a minor, by next friend Mario Hugh GALVEZ–MALDO-NADO; Dominga Hernandez–Hernandez, a minor, by next friend Jose Saul Mira; Alma Yanira Cruz–Aldama, a minor, by next friend Herman Perililo Tanchez, Plaintiffs–Appellees,**

v.

**Edwin MEESE, III; Immigration & Naturalization Service; Harold Ezell, Defendants–Appellants.**

No. 88–6249.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 5, 1989.

Decided June 20, 1990.

As Amended Sept. 7, 1990.

See also 681 F.Supp. 665.

plaintiff class of alien minors whose named representative is Jenny Flores (Flores). The district court held that an INS regulation governing the release of detained alien minors violates substantive due process, and ordered modifications to the regulation. The district court also held that INS procedures fell short of the requirements of procedural due process, and therefore ordered the INS "forthwith" to provide to any minor in custody an "administrative hearing to determine probable cause for his arrest and the need for any restrictions placed upon his release." On appeal, the INS challenges both of the district court's holdings. The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We reverse and remand.

I

This case arises out of the INS's efforts to deal with the growing number of alien children entering the United States by themselves or without their parents (unaccompanied alien minors). Pursuant to 8 U.S.C. §§ 1357(a)(2) and 1252(a)(1), INS agents may arrest and detain aliens, including alien minors, whom they suspect may be deportable. Section 1252(a)(1) provides that

> any such alien taken into custody may, in the discretion of the Attorney General and pending ... final determination of deportability, (A) be continued in custody; or (B) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole.

8 U.S.C. § 1252(a)(1) (emphasis added). Section 1252(a)(1) also authorizes the Attorney General, "in his discretion" and "at any time," to revoke an alien's bond or parole. Plaintiffs are a class of alien minors who are being detained without bail by the INS

Ian Fan, Asst. U.S. Atty., Los Angeles, Cal., for defendants-appellants.

Carlos Holguin, Nat. Center for Immigrants' Rights, Inc., Los Angeles, Cal., for plaintiffs-appellees.

Before WALLACE and FLETCHER, Circuit Judges, and LLOYD D. GEORGE,* District Judge.

WALLACE, Circuit Judge:

The Attorney General and Immigration and Naturalization Service (INS) appeal the district court's summary judgment to a

---

* Honorable Lloyd D. George, United States District Judge, District of Nevada, sitting by desig-

nation.

pending deportation proceedings. The conditions of the plaintiffs' confinement are not at issue in this case. The issue is whether, and in what manner, the plaintiffs may be detained.

■■ Section 1252 applies to *deportable* aliens only. Under our immigration laws, there is a fundamental distinction between "excludable" and "deportable" aliens and a corresponding distinction between exclusion and deportation proceedings. *See* 1 C. Gordon & S. Mailman, *Immigration Law and Procedure* § 1.03[7] (rev. ed. 1989). *Compare* 8 U.S.C. §§ 1221–1230 (provisions relating to entry and exclusion) *with id.* §§ 1251–54 (provisions relating to deportation). Excludable aliens are those who have not "entered" the United States as that term is used in the immigration laws. *See Leng May Ma v. Barber*, 357 U.S. 185, 187–90, 78 S.Ct. 1072, 1073–75, 2 L.Ed.2d 1246 (1958); 8 U.S.C. § 1101(a)(13). By contrast, deportable aliens are those who have entered the United States but whose presence violates the immigration laws. At issue in this case are the statutory provisions governing, and the rights of, deportable aliens only.

Under the statutory framework governing detention of deportable aliens, an alien detained pending deportation proceedings may obtain judicial review of a detention or bond release decision "upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to determine deportability." 8 U.S.C. § 1252(a)(1). Because this provision "deals only with complaints about delays in determining deportability in individual cases," it does not foreclose a challenge to an INS regulation brought under 28 U.S.C. § 1331 rather than in habeas corpus proceedings. *National Center for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1368–69 (9th Cir.1984). After an order of deportation against an alien has been made final, the Attorney General is authorized to detain that alien for up to six months. 8 U.S.C. § 1252(c). After the six months has elapsed, the Attorney General must release

the deportable alien but may thereafter supervise him. 8 U.S.C. § 1252(d).

The Attorney General is authorized by Congress to establish regulations which are necessary to carry out his authority under the immigration laws. 8 U.S.C. § 1103(a). The Attorney General may delegate his responsibilities to other executive officers and indeed has delegated much of his authority over immigration to the Commissioner of the INS, who in turn has authorized the Deputy Commissioner to exercise the same degree of power. 8 U.S.C. § 1103(a); 8 C.F.R. § 100.2 (1988); *see also Patel v. INS*, 638 F.2d 1199, 1201 & n. 1 (9th Cir.1980).

Under 8 U.S.C. § 1252(a)(1), the Attorney General may continue a deportable alien in custody and prescribe bond release conditions. Prior to 1984, no national policy existed regarding when an alien minor in deportation proceedings could be released on bail. By contrast, regulations did exist governing the release of alien minors who were in exclusion proceedings. *See* 8 C.F.R. § 212.5(a)(2)(ii) (1987).

In 1984, the INS's Western Region adopted a policy governing release of detained alien minors in deportation proceedings. The policy provided that

> [n]o minor shall be released except to a parent or lawful guardian. This is necessary to assure that the minor's welfare and safety is [sic] maintained and that the agency is protected against possible legal liability.

> District Directors and Chief Patrol Agents are authorized, in unusual and extraordinary cases, to release a minor to a responsible individual who agrees to provide care and be responsible for the welfare and well being of the child. Release shall not be permitted if any doubt exists that the child will be properly protected.

Four plaintiffs, including named plaintiff Flores, filed this class action on July 11, 1985. The district court subsequently certified a class of alien minors comprising

> [a]ll persons under the age of eighteen (18) years who have been, are, or will be

arrested and detained pursuant to 8 U.S.C. § 1252 by the [INS] within the INS' Western Region and who have been, are, or will be denied release from INS custody because a parent or legal guardian fails to personally appear to take custody of them.

Flores's complaint contained seven claims, only the first two of which are relevant to this appeal. The first claim alleged that the Western Region's bond release condition violated the Immigration & Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, the Administrative Procedure Act (APA), 5 U.S.C. § 552 *et seq.*, the fifth amendment's due process clause and equal protection guarantee, and international law. Flores's second claim challenged the INS's failure to provide (1) "prompt written notice" to the detainee that the bond release condition had been imposed, and (2) "prompt, mandatory, neutral and detached" review following arrest of (a) whether probable cause to arrest existed, (b) whether imposition of the bond condition was necessary to ensure future appearance, and (c) whether any available adult was suitable to ensure the detained juvenile's well-being and appearance at future proceedings. The second claim alleged that these failures violated due process and international law. Plaintiffs' last five claims, which challenged various conditions of the minors' confinement, including the INS's provision for education, recreation, and visitation, were resolved by settlement or motion and are not issues in this appeal.

The INS moved for partial summary judgment, and the district court held that the bond release condition did not violate the INA, APA, or international law, but deferred decision on the due process and equal protection claims until further discovery had been conducted.

Flores subsequently moved for summary judgment on various grounds, and the district court ruled that the bond release condition embodied in the Western Region's policy violated equal protection since no rational reason existed for treating alien minors in exclusion proceedings differently from alien minors in deportation proceedings. Under 8 C.F.R. § 212.5(a)(2)(ii) (1987), alien minors in exclusion proceedings could be paroled to persons other than parents or legal guardians, including relatives such as sisters or brothers as well as non-relatives. Pointing to the fact that the INS had no uniform policy governing the release of alien minors, the district court ordered the INS to treat minors in deportation under the exclusion standards.

Thereafter, on October 15, 1987, the INS published in the *Federal Register* a proposed rule "to codify Service policy regarding detention and release of juvenile aliens and to provide a single policy for juveniles in both deportation and exclusion proceedings." 52 Fed.Reg. 38,245 (proposed Oct. 15, 1987). Comments upon the proposed regulation were requested. *Id.*

Flores moved for summary judgment on the due process issues, which the INS opposed and cross-filed for summary judgment. At the hearing on the motions, the district court was advised that the INS was in the process of publishing the final version of the alien minor detention regulation, and the district court ordered that a copy of the new regulation be filed. The final regulation was published in the *Federal Register* on May 17, 1988, and a copy of it was filed with the district court on the same date. Detention and Release of Juveniles, 53 Fed.Reg. 17,449 (1988). The regulation is now codified at 8 C.F.R. § 242.24 (1989).

The final regulation,[1] which differs only slightly from the proposed regulation, gov-

---

1. The final regulation provides in part:
   § 242.24 Detention and release of juveniles.
   (a) *Juveniles.* A juvenile is defined as an alien under the age of eighteen (18) years.
   (b) *Release.* Juveniles for whom bond has been posted, for whom parole has been authorized, or who have been ordered released on recognizance, shall be released pursuant to the following guidelines:

   (1) Juveniles shall be released, in order of preference, to: (i) A parent; (ii) legal guardian; or (iii) adult relative (brother, sister, aunt, uncle, grandparent) who are not presently in INS detention, unless a determination is made that the detention of such juvenile is required to secure his timely appearance before the Service or the immigration court or to ensure the juvenile's safety or that of others.

erns release of alien "juveniles," defined as aliens under the age of 18. 8 C.F.R. § 242.24 (1988). It provides that an alien minor "for whom bond has been posted ... or who ha[s] been ordered released on recognizance" would be released, in order of preference, to a parent, legal guardian, or adult relative (brother, sister, aunt, uncle, grandparent), provided such person is not in INS detention. *Id.* However, even if such a person is available to accept custody, release will not take place if "a determination is made that the detention of such juvenile is required to secure his timely appearance before the Service or the immigration court or to ensure the juvenile's safety or that of others." *Id.* The INS retains discretion in "unusual and compelling circumstances" to release a juvenile to an adult who is not a parent, legal guardian or adult relative, so long as the adult "executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the INS or an immigration judge." *Id.*

The supplementary information section of the final regulation explained that "the decision of whether to detain or release a juvenile depends on the likelihood that the alien will appear for all future proceedings." 53 Fed.Reg. 17,449. It cautioned, however, that

> with respect to juveniles a determination must also be made as to whose custody the juvenile should be released. On the one hand, the concern for the welfare of the juvenile will not permit release to

just any adult. On the other hand, the Service has neither the expertise nor the resources to conduct home studies for placement of each juvenile released. This rule strikes a balance by providing a list of appropriate custodians while maintaining the discretion of the District Director or the Chief Patrol Agent to release a juvenile to an adult other than those listed individuals in unusual and compelling circumstances.

*Id.* The supplementary information section also summarized various comments on the regulation which had been accepted or rejected. It stated that the INS had rejected the suggestion of several commentators that the list of custodians be expanded to include "any responsible adult." *Id.* It explained that the INS "has attempted to provide for release to those individuals considered responsible for the juvenile's welfare. Release to others ... on a routine basis, would require the performance of home studies for which the Service is neither adequately funded nor qualified." *Id.*

The parties filed supplemental briefs on the effect of the new regulation, and the district court, in a brief, one and one-half page order, granted summary judgment to Flores on her first and second claims "on due process grounds."

We review the entry of summary judgment de novo. *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540 (9th Cir.1989) (en banc). Our review is governed by the same standard used by the trial court under Federal Rule

In cases where the parent, legal guardian or adult relative resides at a location distant from where the juvenile is detained, he or she may secure release at an INS office located near the parent, legal guardian, or adult relative.

(2) If an individual specified in paragraph (b)(1) of this section cannot be located to accept custody of a juvenile, and the juvenile has identified a parent, legal guardian, or adult relative in INS detention, simultaneous release of the juvenile and the parent, legal guardian, or adult relative shall be evaluated on a discretionary case-by-case basis.

(3) In cases where the parent or legal guardian is in INS detention or outside the United States, the juvenile may be released to such person as designated by the parent or

legal guardian in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

(4) In unusual and compelling circumstances and in the discretion of the district director or chief patrol agent, a juvenile may be released to an adult, other than those identified in paragraph (b)(1) of this section, who executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the INS or an immigration judge.
8 C.F.R. § 242.24 (1989).

of Civil Procedure 56(c). *Id.* Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We must view the evidence in the light most favorable to the nonmoving party. *Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 856 F.2d 78, 80 (9th Cir.1988).

## II

Flores first urges us to affirm the district court's modification of section 242.24 on nonconstitutional grounds. In *Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), the Supreme Court cautioned that " '[p]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.' " *Id.* at 854, 105 S.Ct. at 2997, *quoting Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981). The Court characterized this as a " 'fundamental rule of judicial restraint.' " *Id., quoting Three Affiliated Tribes of Berthold Reservation v. Wold Engineering,* 467 U.S. 138, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984). The INS concedes that we may consider the nonconstitutional argument in this appeal.

Arguing that the INS lacks statutory authority to issue the minor detention regulation, Flores seeks to invoke our prior decision in *National Center for Immigrants' Rights v. INS,* 791 F.2d 1351 (9th Cir.1986) (*National Center* ), *cert. granted and vacated,* 481 U.S. 1009, 1009–10, 107 S.Ct. 1881, 1882, 95 L.Ed.2d 489 (vacating and remanding for reconsideration in light of Immigration Reform and Control Act of 1986), *on remand,* 818 F.2d 869 (9th Cir. 1987) (remanding to district court). In *National Center,* we held that the INS exceeded its statutory authority in promulgating a blanket "no-work" bond condition for aliens in deportation proceedings. Despite broad authorization in the statute, we relied on legislative history in holding that the Attorney General's authority "is limited to the imposition of bond conditions which tend to insure the alien's appearance at future deportation proceedings." 791 F.2d at 1356. Flores argues that because the INS regulation at issue in this case does not insure the alien's appearance at deportation proceedings, the INS exceeded its authority in issuing this regulation.

■ Because the Supreme Court vacated our decision in *National Center,* that decision no longer has any legal effect. "The effect of vacating the judgment below is to take away from it any precedential effect." *Troy State University v. Dickey,* 402 F.2d 515, 516 (5th Cir.1968); *see also United States v. Munsingwear, Inc.,* 340 U.S. 36, 41, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950) (stating that motion to vacate judgment "is commonly utilized ... to prevent a judgment, unreviewable because of mootness, from *spawning any legal consequences"*) (emphasis added). Thus, we may not rely on *National Center's* precedential value as a basis for affirming the district court.

Congress has delegated exceptionally broad rulemaking and enforcement powers to the Attorney General under the immigration laws. *See Bilbao–Bastida v. INS,* 409 F.2d 820, 822 (9th Cir.), *cert. dismissed,* 396 U.S. 802, 90 S.Ct. 21, 24 L.Ed.2d 59 (1969); *Hotel & Restaurant Employees Union, Local 25 v. Smith,* 846 F.2d 1499, 1500 (D.C.Cir.1988) (en banc); *Amanullah v. Nelson,* 811 F.2d 1, 4–5 (1st Cir.1987). Under section 1103(a), the Attorney General is authorized to "establish such regulations ... as he deems necessary for carrying out his authority" under chapter 12 of title 8 of the United States Code, 8 U.S.C. §§ 1101–1503. *See also* H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Admin.News 1653, 1687.

■ In *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), the Supreme Court set forth the standard for evaluating the validity of an agency regulation "[w]here the empowering provision of a statute states simply that the agency may 'make ... such rules and regulations as

may be necessary to carry out the provisions of this Act.'" *Id.* at 369, 93 S.Ct. at 1660. The Court concluded that "the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Id.* (footnote omitted), *quoting Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969); *see also Holy Cross Hospital–Mission Hills v. Heckler,* 749 F.2d 1340, 1344 (9th Cir.1984). In *Sam Andrews' Sons v. Mitchell,* 457 F.2d 745 (9th Cir.1972) (*Sam Andrews' Sons*), we articulated a similar standard of review for regulations promulgated in the area of immigration—an area where the Executive Branch possesses residual constitutional authority because of its foreign affairs powers. *See Jean v. Nelson,* 727 F.2d 957, 965 (11th Cir.1984) (en banc) (*Jean*), *aff'd on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). In *Sam Andrews' Sons,* we stated that the Attorney General's regulations promulgated under the INA "must be upheld if they are founded 'on considerations rationally related to the statute he is administering.'" 457 F.2d at 748, *quoting Fook Hong Mak v. INS,* 435 F.2d 728, 730 (2d Cir.1970) (*Fook Hong Mak*); *see also Narenji v. Civiletti,* 617 F.2d 745, 747 (D.C.Cir.1979) (*Narenji*) (same), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). Thus, we need only inquire as to whether the considerations underlying the INS's regulation are rationally related to the statute.

■ In arguing that section 242.24 does not exceed his rule-making authority, the Attorney General does not rely upon the general rulemaking authority granted by section 1103(a) alone. Instead, he argues that the detention regulation is one "he deems necessary for carrying out his authority" specifically granted by 8 U.S.C. § 1252(a)(1), which empowers him "in his discretion" to "continue[ ] in custody" an alien arrested under warrant, or to release such alien "under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe." 8 U.S.C. § 1252(a)(1). Flores counters by arguing that section 1252(a)(1) authorizes only those bond release conditions which serve the sole purpose of ensuring the alien's future appearance at deportation proceedings.

While both parties characterize the INS regulation as imposing a "bond release condition" on alien juveniles, we conclude that the INS regulation actually is closer to a *condition of bail or a condition for release,* at least as applied to the plaintiff class. That is, the regulation does not impose a condition upon plaintiffs which restricts their activities *after* release; instead, it *bars* such release in the first place. *See Matter of Toscano–Rivas,* 14 I & N Dec. 523, 527 (B.I.A.1972), *on reconsideration,* 14 I & N Dec. 538, 539–41 (B.I.A. 1973), *aff'd on other grounds,* 14 I & N Dec. 550, 555 (A.G.1974) (*Toscano–Rivas*) (distinguishing between detention and bond release conditions). Thus, in contrast to the regulation analyzed in *National Center,* the regulation at issue in this case derives primarily from the Attorney General's detention power rather than from his power to prescribe bond conditions. However, since the Attorney General's detention and bond release condition powers are interrelated, and their statutory evolution intertwined, we will examine them together.

Our review of both the language and legislative history of section 1252(a)(1) discloses no intent to limit the Attorney General's power to detain arrested aliens pending deportation proceedings to those situations where detention is necessary to ensure the alien's future appearance. We begin with the language of section 1252(a)(1). The language is extremely broad in authorizing the detention and release on bond of aliens pending deportation proceedings. It provides that *"any … alien taken into custody may, in the discretion of the Attorney General* and pending … final determination of deportability, (A) *be continued in custody;* or (B) be released under bond in the amount of not less than $500 with security approved by the Attorney General, *containing such conditions as the Attorney General may pre-*

*scribe."* 8 U.S.C. § 1252(a)(1) (emphasis added). This language discloses no limitation on the Attorney General's detention powers before an order of deportation is made final, except perhaps that implied by the word "discretion." *See Carlson v. Landon,* 342 U.S. 524, 540–41, 72 S.Ct. 525, 534, 96 L.Ed. 547 (1952) *(Carlson )* (Attorney General's exercise of discretion "can only be overridden where it is clearly shown that it 'was without a reasonable foundation.' "); *Rubinstein v. Brownell,* 206 F.2d 449, 455 (D.C.Cir.1953), *aff'd per curiam by an equally divided court,* 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954). Section 1252(a)(1)'s language certainly does not explicitly or implicitly limit the Attorney General's power to detain to situations where it is necessary to ensure the alien's future appearance.

While section 1252(a)(1) specifically authorizes the Attorney General to prescribe bond release conditions, it does not authorize him to prescribe conditions for release. Instead, the Attorney General is simply authorized, in his discretion, to continue aliens in custody, that is, to deny release pending deportation proceedings. We do not view this as an obstacle to the regulation's validity, however. As mentioned above, section 1103(a) generally authorizes the Attorney General to make regulations which "he deems necessary" to carry out his authority under the immigration laws. 8 U.S.C. § 1103(a). In light of the broad mandate of section 1103(a), "[t]he statute need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him." *Narenji,* 617 F.2d at 747.

Nor does the rather complicated legislative history disclose such a limited congressional purpose behind section 1252(a)(1). Section 1252(a)(1) in its present form derives principally from section 242(a) of the INA. Congress's purpose in passing the INA was "to enact a comprehensive, revised immigration, naturalization, and nationality code." H.R.Rep. No. 1365, *reprinted in* 1952 U.S.Code Cong. & Admin. News 1653, 1653. The particular purpose behind section 242 of the INA was to enact

"detailed and comprehensive provisions relating to the apprehension and deportation of aliens who are within the deportable classes." *Id.* at 1711.

Section 242(a) of the INA had a rather complex genealogy. Its origins can be traced to section 20 of the Immigration Act of 1917. Act of Feb. 5, 1917, ch. 29, § 20, 39 Stat. 874, 890–91 (1917). Section 20 authorized the Department of Labor, then the administering agency, to release an individual on bond pending deportation proceedings. *Id.* The 1917 Act provided that the alien "may be released under a bond in the penalty of not less than $500 with security approved by the Secretary of Labor, *conditioned that such alien shall be produced* when required for a hearing or hearings in regard to the charge upon which he has been taken into custody, and for deportation if he shall be found to be unlawfully within the United States." *Id.* at 891 (emphasis added). The 1917 Act did not explicitly authorize detention; it did so only by implication, by specifying that release on bond was permissible. The Act required as a bond release condition that the alien agree to appear at subsequent proceedings but was silent in regard to the power to impose other conditions.

In 1950, Congress amended section 20 of the 1917 Act through passage of the Subversive Activities Control Act (SACA), enacted as Title I of the Internal Security Act of 1950. Internal Security Act of 1950, Pub.L. 81–831, § 23, ch. 1024, 64 Stat. 987, 1010–12 (1950), *reprinted in* 1950 U.S.Code Cong. & Admin.Serv. 984, 1005–07. The Internal Security Act's purpose was to "deport all alien Communists as a menace to the security of the United States...." *Carlson,* 342 U.S. at 541, 72 S.Ct. at 534. Of particular importance to our inquiry is section 23 of SACA, since section 242(a) of the INA was patterned after it. As the House Report stated, "[section 242], in general, follows the procedure established by section 23 of [SACA]." *See* H.R.Rep. No. 1365, *reprinted in* 1952 U.S.Code Cong. & Admin.News at 1711.

Section 23 of SACA amended section 20 of the 1917 Act to read in part:

Pending final determination of the deportability of any alien taken into custody under warrant of the Attorney General, such alien may, in the discretion of the Attorney General (1) be continued in custody; or (2) be released under bond in the amount of not less than $500, with security approved by the Attorney General.... It shall be among the conditions of any such bond ... that the alien shall be produced, or will produce himself, when required to do so for the purpose of defending himself against the charge or charges under which he was taken into custody ... and for deportation if an order for his deportation has been made.

SACA § 23, *reprinted in* 1950 U.S.Code Cong. & Admin.News 984, 1006. Section 23 expanded the Attorney General's powers in several important ways. First, it expressly authorized detention of aliens pending a final determination of deportability. Second, it clarified that a mandatory condition of every release on bond was that the alien agree to appear at future deportation proceedings, and it implied that other bond conditions could be prescribed. Third, by adding various references to the Attorney General's "discretion," section 23 clarified that decisions regarding detention and release on bond were matters committed to the discretion of the Attorney General. The added reference to the Attorney General's "discretion" was also meant to resolve a split in the circuits by overruling a Sixth Circuit case which had held that the absence of such language in section 20 of the 1917 Act indicated a congressional intent to grant aliens a right to bail pending deportation proceedings. *Carlson*, 342 U.S. at 539, 72 S.Ct. at 533–34.

The legislative history on section 23 of SACA is sparse. The conference report contains little more than a terse statement of Congress's purpose in expanding the Attorney General's powers under section 23: "to provide more effective control over, and to facilitate the deportation of, deportable aliens." H.R.Conf.Rep. No. 3112, 81st Cong., 2d Sess., *reprinted in* 1950 U.S. Code Cong.Serv. 3886, 3899, 3911. In *Carlson*, the Supreme Court traced the lan-

guage of section 23 of SACA back to virtually identical language in the Hobbs Bill, H.R. 10, 81st Cong., 1st Sess., a precursor to SACA which was introduced by Representative Hobbs on January 3, 1949, but never enacted. *Carlson*, 342 U.S. at 538–39, 72 S.Ct. at 533–34. In *Carlson*, the Court looked to the legislative reports on the Hobbs Bill in interpreting the Attorney General's bail power under SACA. *Id.* at 538–39 & n. 32, *quoting* H.R.Rep. No. 1192, 81st Cong., 1st Sess. 6 (1949); S.Rep. No. 2239, 81st Cong., 2d Sess. 5 (1950). Thus, although the Hobbs Bill was never enacted, its legislative history is "wholly relevant" to an understanding of SACA, a subsequent statute, since the operative language in both was substantially the same. *See United States v. Enmons*, 410 U.S. 396, 404 n. 14, 93 S.Ct. 1007, 1012 n. 14, 35 L.Ed.2d 379 (1973); *Toscano–Rivas*, 14 I & N Dec. at 554 n. 13 ("[T]he reports on H.R. 10 can appropriately be regarded as part of the legislative history of [SACA]."). This is especially true in this case, since the relevant language of section 23 of SACA governing release was taken verbatim from the Hobbs Bill. *Compare* SACA § 23, *reprinted in* 1950 U.S.Code Cong.Serv. 984, 1005, *with* H.R.Rep. No. 1192, 81st Cong., 1st Sess. 2 (1949).

An examination of the House and Senate Reports on the Hobbs Bill reveals that Congress intended the Attorney General's power to detain and formulate bond conditions to be exceptionally broad. *See* H.R.Rep. No. 1192, 81st Cong., 1st Sess. (1949); S.Rep. No. 2239, 81st Cong., 2d Sess. (1950). Both reports contained the same explanation of how the bill would alter the 1917 Act:

Existing law merely states generally that pending the final disposal of the case of any alien so taken into custody, he may be released under a bond of not less than $500, with security approved by the Attorney General, and conditioned that he shall be produced when required for a hearing on the charges against him and for deportation if found unlawfully in this country.

... Th[is] bill will *expressly authorize the Attorney General, in his discretion, to hold arrested aliens in custody,* or to release them under bond ..., pending final determination of their deportability and for a 6–month period after an order of deportation is issued.... The bill further provides that *among* the conditions of any bond exacted ... there shall be a condition that the alien shall be produced when required for defense against the charges upon which he appears to be deportable and for deportation if he is found subject to that action.... These provisions, of course, enumerate *only one* of the conditions which is mandatory in the bond or as a parole condition. The bill intends that the Attorney General shall have *full discretion* in imposing *any other conditions or terms* in the bond or parole agreement *which he may see fit to include.* Thus, a man released on bond might have as a condition of the bond that he also be subject to make periodic reports to the immigration officials as to his whereabouts and furnish other desired information. Or a bond might provide as one of its conditions that upon demand by the Attorney General the existing bond shall be surrendered and a new bond in greater or less amount or other conditions shall be furnished. The bill intends that the Attorney General shall have *untrammeled authority* to impose *such conditions or terms as he sees fit* in releasing an alien under bond ... pending final determination of the deportability of the alien and for six months after an order of deportation has been issued against him.

S.Rep. No. 2239, 81st Cong., 2d Sess. 5 (1950) (emphasis added); *see also* H.R.Rep. No. 1192, 81st Cong., 1st Sess. 5–6 (1949).

To summarize, the Hobbs Bill, upon which section 23 of SACA was patterned, was meant to confer broad power upon the Attorney General to detain aliens prior to a final determination of deportability. Section 242(a) of the 1952 INA carried forward the provisions of section 23 of SACA. In its final form, section 242(a) did, however, include additional language which made explicit what had been only implicit in its predecessor provisions: that the Attorney General was authorized to prescribe bond conditions beyond merely ensuring appearance. *See* INA § 242(a), *reprinted in* 1952 U.S.Code Cong. & Admin.News 166, 208–09 (authorizing "release[ ] under bond in the amount of not less than $500 with security approved by the Attorney General, *containing such conditions as the Attorney General may prescribe*") (emphasis added).

In *Carlson,* the Supreme Court, after reviewing the legislative history of section 23 of SACA, concluded that "the language of the reports is emphatic in explaining Congress' intention to make the Attorney General's exercise of discretion presumptively correct and unassailable except for abuse."' 342 U.S. at 540, 72 S.Ct. at 534. "Courts that have reviewed decisions denying aliens bail since the 1952 Act have, apparently unanimously, transferred the presumption [of correctness] to cases under that Act." *United States ex rel. Barbour v. District Director of the INS,* 491 F.2d 573, 577–78 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974).

Despite the broad authorization to detain and set conditions of bond reflected by the statutory language and legislative history, *see also id.* at 577, the Attorney General's detention power is not limitless. *See Carlson,* 342 U.S. at 544, 72 S.Ct. at 536 (in upholding Congress's delegation of power to Attorney General under Subversive Activities Control Act to hold subversive resident aliens without bail, observing that "[t]he authority to detain without bail is to be exercised within the framework of the ... Act to guard against Communist activities pending deportation hearings."). Thus, while the Attorney General may not act in a manner "totally unrelated to the various purposes of the immigration laws," *Toscano–Rivas,* 14 I & N Dec. at 554, he does have broad discretion in acting to fulfill the purposes of those laws.

In light of the foregoing, we reject Flores's argument that any regulation structuring the Attorney General's discretion to detain arrested aliens pending de-

portation proceedings exceeds his statutory authority unless it serves the *sole* purpose of ensuring the alien's future appearance at deportation proceedings. There is no question that one, and perhaps the primary, purpose of detention under section 1252(a)(1) is to ensure the future appearance at deportation proceedings. *See id.* 342 U.S. at 542, 72 S.Ct. at 535. In *Carlson*, however, the Supreme Court endorsed a broader concept of the Attorney General's discretion to refuse release than that advanced by Flores. The Court there explained that "the discretion reposed in the Attorney General [to deny release under SACA] is at least as great as that found by the Second Circuit in the *Potash* case, *supra*, to be in him under the former bail provision [section 20 of the Immigration Act of 1917]." 342 U.S. at 540, 72 S.Ct. at 534. On the opinion's preceding page, the Court had quoted a passage from *United States ex rel. Potash v. District Director of INS*, 169 F.2d 747 (2d Cir.1948) (*Potash* ), which read:

> The discretion of the Attorney General ... is interpreted as one which is to be reasonably exercised upon a consideration of such factors, among others, as the probability of the alien being found deportable, the seriousness of the charge against him, if proved, the danger to the public safety of his presence within the community, and the alien's availability for subsequent proceedings if enlarged on bail.

*Carlson*, 342 U.S. at 539–40 n. 33, 72 S.Ct. at 534 n. 33, *quoting Potash*, 169 F.2d at 751. Since these factors go beyond merely ensuring the appearance at future proceedings, Flores's argument fails.

We next consider whether the INS's regulation is "founded 'on considerations rationally related to the statute [it] is administering.'" *Sam Andrews' Sons*, 457 F.2d at 748, *quoting Fook Hong Mak*, 435 F.2d at 730. We conclude that it is. The regulation is rationally related to the purpose of ensuring the detained minor's appearance at future proceedings. The supplementary information section of the final regulation clearly explains that "the decision of whether to detain or release a juvenile de-

pends on the likelihood that the alien will appear for all future proceedings." 53 Fed.Reg. at 17,449. Although under section 242.24(b)(1), a juvenile may be released to a parent, legal guardian or adult relative not in INS detention, the INS may refuse to release the alien minor if it determines "that the detention of such juvenile is required to secure his timely appearance before the Service or the immigration court." In addition, release either to a person designated by the parent or guardian under section 242.24(b)(3), or to an adult other than a parent, legal guardian or adult relative under section 242.24(4), is contingent upon the receiving person's execution of an agreement "to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge." 8 C.F.R. § 242.24(b)(3) (1989). These features establish a rational relationship to the goal of ensuring future appearance.

The regulation serves other purposes as well, in particular the goal of ensuring the alien minor's well-being by favoring release to certain relatives or legally responsible parties, and the related goal of limiting the INS's legal liability by not releasing alien juveniles to someone other than an enumerated party. We view these other purposes as rationally related to effecting the purposes of the statute. In the supplementary information section of the final regulation, the INS explained that:

> On the one hand, the concern for the welfare of the juvenile will not permit release to just any adult. On the other hand, the Service has neither the expertise nor the resources to conduct home studies for placement of each juvenile released. This rule strikes a balance by providing a list of appropriate custodians while maintaining the discretion of the District Director or the Chief Patrol Agent to release a juvenile to any adult other than those listed individuals in unusual or compelling circumstances.

53 Fed.Reg. 17,449. This explanation of the regulation offers a legitimate and reasoned justification for its provisions. The presence of these other purposes does not

render the regulation beyond the Attorney General's rulemaking authority.[2]

## III

Having concluded that the INS did not exceed its statutory authority in promulgating the detention regulation, we turn now to Flores's constitutional challenges, which consist of a substantive and a procedural due process claim.

### A.

We first consider Flores's substantive due process claim. The INS argues that the district court erred in holding that the INS's regulation violates substantive due process.

■ The due process clause of the fifth amendment provides that "[n]o person shall ... be deprived of life, liberty or property, without due process of law." The fifth amendment's due process clause applies to aliens within the jurisdiction of the United States, even if their "presence in this country is unlawful." *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1975) (*Diaz*); *see also Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896). Thus, the fifth amendment generally applies to the plaintiff class.

■ Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin v. Cal-*

*ifornia*, 342 U.S. 165, 172 [72 S.Ct. 205, 209, 96 L.Ed. 183] (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325–26 [58 S.Ct. 149, 152, 82 L.Ed. 288] (1937)." *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). Our analysis begins with determining whether the protection of the due process clause's substantive component, as distinguished from its procedural component, extends to deportable aliens.

Flores's constitutional claims arise in the unique context of our immigration laws. The power over immigration is political in nature and therefore vested in the political branches. *Diaz*, 426 U.S. at 81–82, 96 S.Ct. at 1891–92; *Fong Yue Ting v. United States*, 149 U.S. 698, 713, 13 S.Ct. 1016, 1022, 37 L.Ed. 905 (1893) (*Fong Yue Ting*); *Jean*, 727 F.2d at 964–65. The Constitution specifically authorizes Congress to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. But the statutory and regulatory mandates involved in this case did not emanate from this constitutional grant of authority. As the Eleventh Circuit in *Jean* aptly observed, "[i]t is worth emphasizing that while the Court could have implied the power to regulate immigration from constitutional grants of legislative powers such as the right to declare war, to approve treaties, to regulate foreign commerce, to establish a uniform rule of naturalization, and to enact all nec-

---

**2.** The dissent accuses the majority of "go[ing] to great lengths to deny liberty to children whose only possible offense is their alienage," *infra* at 1014, and later implies that the majority is "so unfeeling as to be unconcerned with the tragic effects on children." *Infra* at 1025. With all due respect to the dissenter, we cannot agree that the court's decision whether to require the release of children illegally in the country to unrelated adults is one that should be resolved by attempted characterizing or mischaracterizing the judges' personal feelings. We suggest that an objective analysis of the INS's rule demonstrates it to be a reasonable compromise reached by an agency with limited resources. The dissent assumes, without record support, that release of the children to *unrelated* adults would be far preferable to detainment by the INS. However, the INS thinks otherwise and, unlike the three members of this panel, it had the benefit of notice and comment rulemaking.

As the INS has made clear, it does not possess the resources to undertake a home study of unrelated adults who seek custody of the children. *See supra* at 1002. Thus, if we were to adopt the dissent's approach and order the INS to release the children to unrelated adults, there would be no way to ensure that the children would not be released to child abusers, sexual deviants, or adults that would subject the children to severe neglect. Consequently, the dissent is incorrect in assuming that release of the children to unrelated adults would necessarily benefit the children more than continued detention. Indeed, the risks involved in releasing the children to unknown adults may be far greater than the risks of continued detention. In any event, even if the INS's policy may not be the best possible policy, we are bound to uphold it if it has a rational basis. All we conclude is that it has.

essary and proper laws, the Court instead declared that 'the control of immigration [is] an implied power arising out of national sovereignty and existing without regard to any constitutional grant.' " *Jean*, 727 F.2d at 964, *quoting* 1 C. Gordon & H. Rosenfield, *Immigration Law & Procedure* § 2.2a (rev. 1982); *see also Chae Chan Ping v. United States [The Chinese Exclusion Case]*, 130 U.S. 581, 603–06, 9 S.Ct. 623, 629–30, 32 L.Ed. 1068 (1889); *Fong Yue Ting*, 149 U.S. at 711, 13 S.Ct. at 1021 (characterizing the "right to exclude or to expel all aliens" as "an inherent and inalienable right of every sovereign and independent nation"); *Augustin v. Sava*, 735 F.2d 32, 36 (2d Cir.1984).

■ Although the executive and legislative branches in theory possess concurrent authority over immigration, "[i]n practice ... the comprehensive character of the INA vastly restricts the area of potential executive freedom of action, and the courts have repeatedly emphasized that the responsibility for regulating the admission of aliens resides in the first instance with Congress." *Jean*, 727 F.2d at 965; *see also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950); *Fong Yue Ting*, 149 U.S. at 713, 13 S.Ct. at 1022. The Supreme Court has long recognized Congress's paramount power to control matters of immigration. *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (*Fiallo*); *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954) (*Galvan*); *Carlson*, 342 U.S. at 534, 72 S.Ct. at 531; *Harisiades v. Shaughnessy*, 342 U.S. 580, 589–90, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952); *Fong Yue Ting*, 149 U.S. at 713, 13 S.Ct. at 1022; *The Chinese Exclusion Case*, 130 U.S. at 609, 9 S.Ct. at 631. Congressional power in this area is plenary; the Court has repeatedly stressed that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo*, 430 U.S. at 792, 97 S.Ct. at 1478, *quoting Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). In exercising its broad power over immigration and naturalization, " 'Congress regularly makes rules that would be unacceptable if applied to citizens.' " *Id.*, 430 U.S. at 792, 97 S.Ct. at 1478, *quoting Diaz*, 426 U.S. at 80, 96 S.Ct. at 1891. Because Congress's power over immigration is plenary and political in nature, the exercise of that power is subject " 'only to narrow judicial review.' " *Id.*, *quoting Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 1904–05 n. 21, 48 L.Ed.2d 495 (1976) (*Hampton*); *Diaz*, 426 U.S. at 81–82, 96 S.Ct. at 1892; *Kleindienst v. Mandel*, 408 U.S. 753, 765–67, 92 S.Ct. 2576, 2582–84, 33 L.Ed.2d 683 (1972) (*Mandel*); *Galvan*, 347 U.S. at 530–32, 74 S.Ct. at 742–43.

■ The plenary power of Congress and the narrowness of judicial review in the immigration context is reflected in the Supreme Court's teaching that any substantive due process rights aliens might have are extremely limited. Indeed, the Court's first two important cases in this area suggested that deportable aliens had *no* substantive due process rights. In *Harisiades*, the Court upheld the deportation, under the Alien Registration Act of 1940, of legally resident aliens who had been members of the Communist Party before the 1940 Act's enactment. The Court rejected the aliens' argument that Congress's power to deport "is so unreasonably and harshly exercised by this enactment that it should be held unconstitutional [under the Due Process Clause]." 342 U.S. at 588, 72 S.Ct. at 516. Though acknowledging that the Act under review "stands out as an extreme application of the expulsion power," *id.*, the Court concluded that "in the present state of the world, it would be rash and irresponsible to reinterpret our fundamental law to *deny or qualify* the Government's power of deportation." *Id.* at 591, 72 S.Ct. at 520 (emphasis added). Earlier in its discussion of the substantive due process claim, however, the Court observed that "[i]t is not necessary and probably not possible to delineate a fixed and precise line of separation in these matters between political and judicial power under the Constitution." *Id.* at 590, 72 S.Ct. at 519; *see*

*also id.* at 588–89, 72 S.Ct. at 518–19 ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be *largely* immune from judicial inquiry or interference.") (footnote omitted) (emphasis added). Justice Frankfurter's separate concurrence was free of such ambiguity regarding the constitutional limits of Congress's power: "the underlying policies of what classes of aliens shall be allowed to enter and what classes shall be allowed to stay, are for Congress exclusively to determine even though such determination may be deemed to offend American traditions...." *Id.* at 597, 72 S.Ct. at 523 (Frankfurter, J., concurring).

Two years later the Court decided *Galvan,* which rejected a similar challenge to the Internal Security Act of 1950. Like the 1940 Act, the Internal Security Act authorized the deportation of legally resident aliens on the grounds that they had once been members of the Communist Party. Galvan argued that the 1950 Act violated substantive due process because it allowed the government to deport him without proving that (1) while a member of the Communist Party, he knew that it advocated violence, or (2) that the Communist Party did in fact advocate violence while he was a member. Viewing *Harisiades* as controlling, the Court, this time with Justice Frankfurter writing for the majority, rejected both arguments. As for Congress's decision to dispense with the requirement of proving, in individual cases, that the Communist Party did advocate violent overthrow of the government, the Court stated that it "cannot say that this classification by Congress is so baseless as to be violative of due process and therefore beyond the power of Congress." *Id.* at 529, 72 S.Ct. at 528. This statement implies that some statute might fail to pass muster under the due process clause. The Court went on, however, to address Galvan's argument that the statute was uncon-

stitutional because it did not require individualized proof that, while a member, he was aware of the Communist Party's advocacy of violence:

In light of the expansion of the concept of substantive due process as a limitation upon all powers of Congress, even the war power ... much could be said for the view, were we writing on a clean slate, that the Due Process Clause *qualifies* the scope of political discretion heretofore recognized as belonging to Congress in regulating the entry and deportation of aliens....

But the slate is not clean. As to the extent of the power of Congress under review, there is not merely "a page of history," but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the *enforcement* of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. *But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.*

347 U.S. at 530–31, 74 S.Ct. at 743 (citations omitted). The quoted passage suggests that the due process clause places no substantive limitation on congressional power in this area, in spite of some language in *Galvan* and *Harisiades* which could be interpreted to mean that the substantive component of the due process clause might pose some undefined check upon Congress's deportation power.

Both *Galvan* and *Harisiades* concerned substantive due process challenges to the terms or classifications embodied in congressional *statutes.* Several subsequent cases have confirmed that there appears to be little or no substantive due process review available for such congressional choices. *See, e.g. Buchowiecki–Kortkiewicz v. United States INS,* 455 F.2d 972, 972 (9th Cir.), *cert. denied,* 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 103 (1972); *Matter of*

*Longstaff,* 716 F.2d 1439, 1442–43 (5th Cir. 1983) (dicta as to immigration; case dealt with naturalization), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984); *Anetekhai v. INS,* 876 F.2d 1218, 1222 (5th Cir.1989) (*Anetekhai*). Moreover, courts have repeatedly held that there is no substantive due process right not to be deported. *See, e.g., Doherty v. Meese,* 808 F.2d 938, 944 (2d Cir.1986); *Linnas v. INS,* 790 F.2d 1024, 1031 (2d Cir.), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986); *Bassett v. United States INS,* 581 F.2d 1385, 1386 (10th Cir.1978). In our circuit, we have summarily rejected such challenges to deportation orders numerous times. *See, e.g., Tsimbidy–Rochu v. INS,* 414 F.2d 797, 798 (9th Cir.1969) (per curiam); *Rodriguez–Romero v. INS,* 434 F.2d 1022, 1024 (9th Cir.1970) (per curiam), *cert. denied,* 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971); *MacKay v. Turner,* 283 F.2d 728, 728 (9th Cir.1960) (per curiam).

In three subsequent cases dealing with both equal protection and substantive due process challenges under the fifth amendment, the Supreme Court both reaffirmed and clarified the principles of *Galvan* and *Harisiades. Fiallo,* 430 U.S. at 792–93 & n. 4, 97 S.Ct. at 1478 & n. 4; *Hampton,* 426 U.S. at 99–103, 96 S.Ct. at 1903–05; *Mandel,* 408 U.S. at 766–67, 769–70, 92 S.Ct. at 2583–84, 2585. We read *Hampton, Fiallo* and *Mandel* as indicating that the substantive component of the due process clause does operate as some limited constraint on congressional power, though the scope of judicial review on this basis is extremely narrow. *See Fiallo,* 430 U.S. at 793 n. 5, 795 n. 6, 97 S.Ct. at 1478 n. 5, 1479 n. 6; *Hampton,* 426 U.S. at 101, 96 S.Ct. at 1904; *Mandel,* 408 U.S. at 769–70, 92 S.Ct. at 2585 (excludable alien).

Having determined that the substantive component of the fifth amendment's due process clause has some application, in a limited way, to the INS's detention regulation, we next consider the level of scrutiny which is applicable to the regulation. The parties assume that the usual framework of analysis for substantive due process applies. This analytical framework requires a threshold choice between two available levels of scrutiny. When the government "impairs the exercise of a fundamental right," we apply a strict scrutiny standard, which requires the government to "prove to the Court that the law is necessary to promote a compelling or overriding interest." *Christy v. Hodel,* 857 F.2d 1324, 1329 (9th Cir.1988) (*Christy*) (citations and internal quotations omitted), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989). However, if there is no infringement of a fundamental right, we apply a rational relation test, according to which "the law need only rationally relate to any legitimate end of government." *Id.* (citations and internal quotations omitted). The Supreme Court recently has advised against expanding the list of fundamental rights which have attenuated roots in the language of the Constitution. *Bowers v. Hardwick,* 478 U.S. 186, 194–95, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986) ("The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.").

Having assumed that the traditional substantive due process framework applies, the parties go on to offer different definitions of the right at stake. Flores claims abridgement of a fundamental right to be free from physical restraint—a right to physical liberty. The INS disagrees, contending that the right claimed is a right of minors in deportation proceedings to be released to unrelated adults. While Flores argues that the right to be free from physical restraint is a fundamental right, the INS contends that the right to be released to an unrelated adult is not fundamental.

We agree with the INS that the right at stake is the right to be released to an unrelated adult. In a substantive due process analysis, the right at stake must be defined narrowly. *See Christy,* 857 F.2d at 1327–30 (in substantive due process challenge to Endangered Species Act, rejecting plaintiff's definition of asserted right as right "to possess and protect property," and defining right at stake narrowly as

"right to kill federally protected wildlife in defense of property"); *see also Almario v. Attorney General*, 872 F.2d 147, 151 (6th Cir.1989) (*Almario*) (in rejecting argument that Immigration Marriage Fraud Act violates due process by unreasonably burdening "fundamental right to marry," stating that "the Constitution does not recognize the right of a citizen spouse to have his or her alien spouse remain in this country"). The INS's regulation does not bar release of all alien juveniles. It bars release of alien juveniles who are likely to abscond or who, though not likely to abscond, do not have an identifiable parent, legal guardian or adult relative who can accept custody or designate an appropriate custodian. Moreover, Flores has cited no case to support the proposition that the Constitution ensures a fundamental right of alien juveniles in deportation proceedings to be released to unrelated adults. Given the Constitution's assignment of the plenary political power over deportation to the legislative and executive branches, it is clear that no such right exists. As the Supreme Court stated in *Diaz*, "[a]ny rule of constitutional law that would inhibit the flexibility of the political branches of government to respond [in the immigration area] to changing world conditions should be adopted only with the greatest caution." 426 U.S. at 81, 96 S.Ct. at 1892 (footnote omitted). In light of the Court's admonition in *Hardwick*, we hold that there is no such "fundamental" right in this case.[3]

3. The dissent disagrees with the narrow way we characterize the right at stake in this case. The dissent suggests that our analysis in determining the right at stake conflicts with the approach used by the Supreme Court in *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), *New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *Infra* at 1343. Yet in all three of those cases, the right at stake was already rooted in the text of the Constitution—namely, in the first amendment. We do not claim that textually rooted rights should be characterized more narrowly than the text suggests; rather, we simply hold that in dealing with *unenumerated* substantive due process rights, where there exists no textual guidance, it is proper to construe rights narrowly.

The dissent argues that *Hardwick* has no applicability to this case. *Infra* at 1019–1020. We disagree. *Hardwick* clearly demonstrates that, in the area of substantive due process, the list of "fundamental rights" is to be construed narrowly. This is plainly evidenced by a comparison of the majority and dissenting opinions in *Hardwick*. The dissent's position—that the right at stake should be defined at the highest rather than the lowest level of generality—is the same position as that taken by Justice Blackmun in his dissent in *Hardwick*. In the first paragraph of that dissent, Justice Blackmun takes issue with the majority's characterization of the right at stake as "a fundamental right to engage in homosexual sodomy." 478 U.S. at 199, 106 S.Ct. at 2848 (internal quotations omitted). Instead, he would characterize the right at a much higher level of generality: "'the right to be let alone.'" *Id., quoting, Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). The majority in *Hardwick* properly rejected this broad characterization of the right in favor of the narrow-

er formulation. The majority opinion in *Hardwick* thus provides solid support for our decision to characterize the substantive due process right narrowly.

The dissent also contends that the right to "liberty" or "physical liberty" is enumerated in the text of the Constitution and must therefore be considered a fundamental right. We find no support for this position. While it is true that the fifth and fourteenth amendment due process clauses mention the word "liberty," this does not mean that the "right to liberty" is a free-floating fundamental substantive due process right. Rather, as Justice Scalia has recently reminded us, "[t]he text of the Due Process Clause does not protect individuals against deprivations of liberty *simpliciter*. It protects them against deprivations of liberty 'without due process of law.'" *Cruzan v. Director, Missouri Department of Health*, —— U.S. ——, ——, 110 S.Ct. 2841, 2850, 111 L.Ed.2d 224 (1990) (Scalia, J., concurring). To hold otherwise would mean, among other things, that courts would be required to review the sentence of every prisoner incarcerated in the United States under strict scrutiny so as to ensure that their fundamental substantive due process "right to liberty" was not being infringed.

The dissent concludes that the children possess a fundamental substantive due process right to "freedom from physical restraint." *Infra* at 1019. The dissent claims that while there may be disagreement over the term "liberty" in the Constitution, there is "no dispute" that "its core reference is to freedom from physical restraint, and that the interest is fundamental." *Id.* While this may be true in the procedural due process context, it is not true in the substantive due process context. No court has ever recognized a fundamental *substantive* due process right to physical liberty. Not surprisingly, therefore, the dissent cites no compelling authority in support of this sweeping assertion.

This conclusion is consistent with the Supreme Court's holdings regarding the constitutional rights of children. Recognizing that children possess "fundamental rights which the State must respect," *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969) (free speech rights); *see also Bellotti v. Baird*, 443 U.S. 622, 633, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797 (1979) (*Bellotti*) (plurality) ("A child, merely on account of his minority, is not beyond the protection of the Constitution."), is "but the beginning of the analysis." *Bellotti*, 443 U.S. at 633, 99 S.Ct. at 3043. The Supreme Court has often stated that constitutional rights of children are not coextensive with those of adults. In *Schall v. Martin*, 467 U.S. 253, 263–66, 104 S.Ct. 2403, 2409–11, 81 L.Ed.2d 207 (1984) (*Schall*), the Court, acknowledging that the state may restrict a child's liberty interest in order to secure that child's welfare, upheld the constitutionality of a New York statute authorizing the pretrial detention of juveniles under certain narrow circumstances. The Court reasoned:

> The juvenile's ... interest in freedom from institutional restraints, even for the brief time involved here, is undoubtedly substantial.... But that interest must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody. Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*. In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's "*parens patriae* interest in preserving and promoting the welfare of the child."

*Id.* at 265, 104 S.Ct. at 2410 (citations omitted), *quoting Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982).

In *Bellotti*, a plurality of the Supreme Court articulated three reasons "justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." 443 U.S. at 634, 99 S.Ct. at 3043. While only three other Justices joined Justice Powell's plurality opinion in *Bellotti*, neither the four concurring Justices nor the lone dissenter disputed Justice Powell's summary of rationales reflected in the case law for affording children lesser constitutional rights than adults. Because the three *Bellotti* factors represent the Court's only reasoned discussion to date of the possible bases for distinguishing minors'

The dissent relies primarily upon *United States v. Salerno*, 481 U.S. 739, 751, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987), to support this argument. Yet a few lines after the passage quoted by the dissent, the Supreme Court stated that "we *cannot* categorically state that pretrial detention 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* (emphasis added), *quoting Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). The Court in *Salerno* thus unequivocally rejects the idea advanced by the dissent that there exists a fundamental right to physical liberty. Certainly, if, as the Court holds in *Salerno*, pretrial detention does not implicate the "fundamental right" to physical liberty urged by the dissent, such a fundamental right cannot be said to exist.

The dissent also cites *DeShaney v. Winnebago County DSS*, 489 U.S. 189, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989), in support of its assertion. *Infra* at 1020. In *DeShaney*, however, all the Court held is that the state's act of physically restraining an individual "trigger[s]" the protections of substantive due process. *Id.* The Court did not hold that individuals restrained by the state possessed a fundamental right to physical liberty, but rather that, once they were restrained, substantive due process required that they should be provided with "basic human needs." *Id.* 109 S.Ct. at 1005.

Finally, the dissent cites for support *Ingraham v. Wright*, 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977). *Infra* at 1020. Yet since *Ingraham* was a *procedural* due process case, it obviously fails to support the assertion that there exists a fundamental, *substantive* due process right to freedom from physical restraint.

In short, the dissent advances no authority for the proposition that the right to be free from physical restraint is recognized as an enumerated, or even unenumerated, substantive due process right. In the absence of such authority, we cannot accept the dissent's assertion.

constitutional rights from adults, they are frequently cited as controlling in cases that require such a distinction. *See, e.g., Johnson v. City of Opelousas,* 658 F.2d 1065, 1073 (5th Cir.1981); *McCollester v. City of Keene,* 586 F.Supp. 1381, 1385–86 (D.N.H. 1984).

In our view, all of the *Bellotti* factors are implicated in this case, but especially the first. The INS's regulation governing the detention of minors is based at least in part upon a concern for the "peculiar vulnerability" of alien minors. *See Bellotti,* 443 U.S. at 635, 99 S.Ct. at 3043 ("Viewed together, our cases show that although children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability....."). We view the INS's regulation as an exercise of governmental power which takes into account the peculiar vulnerability of alien children. The exercise of such power does not encroach upon a fundamental right.

■ Since there is no fundamental right implicated in this case, we must apply minimal scrutiny to the INS regulation, and consider whether the regulation was rationally related to any legitimate end of government. But, once more, we must fashion our review based upon the type of case before us. Even where a fundamental right is arguably at stake, there is a strong presumption for rational basis review in the context of immigration cases. *See Adams v. Howerton,* 673 F.2d 1036, 1041 (9th Cir.) (declining to consider whether homosexual couple had fundamental "right to marry" which was infringed by immigration statute, and holding that "[e]ven if it were [a fundamental right], we would not apply a strict scrutiny standard of review to the statute" given Congress's plenary power over immigration), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982); *see also Anetekhai,* 876 F.2d at 1218 (Marriage Fraud Amendments to the Immigration and Nationality Act); *Almario,* 872 F.2d 147 (same); *Ademi v. Moyer,* 1989 WL 56904, 1989 U.S.Dist. LEXIS 5953

(N.D.Ill. May 22, 1989) (same); *Escobar v. Immigration & Naturalization Service,* 700 F.Supp. 609 (D.D.C.1988) (same); *Smith v. Immigration & Naturalization Service,* 684 F.Supp. 1113 (D.Mass.1988) (same).

■ Flores argues that the INS's regulation is not rationally related to a legitimate end of government. The INS cites four interests served by the regulation: (1) ensuring the minors' appearance at future deportation proceedings; (2) fostering the welfare or safety of the detained minors; (3) insulating the INS from liability for harm befalling released minors; and (4) administrative economy, since the INS does not have the resources to conduct the home studies necessary to determine whether adults outside the regulation would be responsible. These are all legitimate ends for the INS to pursue in this context, and the regulation is rationally related to these goals.

Flores contends, however, that the INS presented no evidence that the regulation furthered any of the asserted interests. Flores also argues that the actual purpose behind the regulation is to capture the illegal alien parents of detained minors, though Flores has pointed to nothing in the record which supports this contention. In addition, Flores argues that the INS's cost efficiency interest is undermined by the cost of detention, which can reach $100 per day per child. All three of these contentions, however, reflects a misunderstanding of the minimum scrutiny test. Under that test, a law "will be upheld if the court can hypothesize any possible basis on which the legislature might have acted." *Christy,* 857 F.2d at 1329; *see also id.* at 1328 n. 2; *United States v. Barajas–Guillen,* 632 F.2d 749, 754 (9th Cir.1980) (*Barajas–Guillen* ). "Since the court itself may postulate a basis for the legislation, satisfaction of the rationality test should be deemed a legal, rather than a factual, issue." *Christy,* 857 F.2d at 1328 n. 2; *see also Barajas–Guillen,* 632 F.2d at 753–54. Moreover, once the interests or purposes served are delineated, Flores bears the burden of demonstrating that there is no ra-

tional connection between these purposes and the regulation. *Harrah Independent School District v. Martin*, 440 U.S. 194, 198, 99 S.Ct. 1062, 1064, 59 L.Ed.2d 248 (1979) (per curiam). Since Flores has failed to carry this burden, we conclude that the regulation is indeed rationally related to the interests noted above.

Bearing in mind the very limited nature of our substantive due process review in this field of law, it is clear that Flores's substantive due process challenge to the regulation must be rejected. To the extent the district court based its ruling on this prong of due process law, it must be reversed.

**B.**

■■■ The INS next challenges the district court's summary judgment on Flores's *procedural* due process claim. Aliens in deportation proceedings enjoy certain procedural due process rights under the fifth amendment. *Baires v. INS*, 856 F.2d 89, 90 (9th Cir.1988). In order to understand Flores's procedural due process claim, we must briefly review the INS's existing procedures both for arresting and for setting release and bond conditions of aliens who are believed to be deportable.

A deportation proceeding is commenced when the INS files with the Office of the Immigration Judge, an Order to Show Cause why the respondent should not be deported. 8 C.F.R. § 242.1(a) (1988). Under 8 U.S.C. § 1252(a)(1), the Attorney General is empowered to issue warrants for arrest and take into custody aliens suspected of being deportable. The regulations authorize the issuance of an arrest warrant once the Order to Show Cause is issued. *See* 8 C.F.R. § 242.2(b)(1) (1988).

By statute, an immigration officer is also empowered to arrest *without a warrant*: any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States. . . .

8 U.S.C. § 1357(a)(2). For aliens arrested without a warrant, the applicable regulations provide that the alien must be examined as provided in section 1357(a)(2) "by an officer other than the arresting officer" (examining officer) unless "no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay," in which case the arresting officer may examine the alien. 8 C.F.R. § 287.3 (1988). The examining officer is an INS officer, not an immigration judge (IJ). *See* 8 C.F.R. § 1.1(1) (1988). If the examining officer "is satisfied that there is prima facie evidence establishing that the arrested alien is in the United States in violation of the immigration laws," then the officer will take steps to initiate deportation proceedings. 8 C.F.R. § 287.3 (1988). The regulations do not define "prima facie evidence." Once the examining officer has determined that prima facie evidence exists, the alien is advised of various rights and informed that a decision on custody will be made within 24 hours. *Id.* The alien is also informed that his case "shall be presented promptly, and in any event within 24 hours, for a determination as to whether there is prima facie evidence [of illegal presence] and for issuance of an order to show cause and warrant of arrest as prescribed in Part 242 of this chapter." *Id.*

The amount of bond and conditions of release are set by INS officials. Under the regulations, a custody or bond decision for aliens arrested without a warrant must be made within 24 hours after the appearance before the examining officer. 8 C.F.R. § 287.3 (1988). The regulation governing release and bond decisions is 8 C.F.R. § 242.2 (1988). It provides that once release or bond conditions are set, the alien "may apply to any officer authorized by this section" for release or an amelioration of bond conditions. 8 C.F.R. § 242(b) (1988). Alternatively, an alien detained or released on bond may obtain review in a bond redetermination hearing before an IJ.

8 C.F.R. § 242.2(c) (1988). Such a hearing is available only "upon application by" the alien. *Id.* The regulations do not require the IJ to decide motions relating to bond conditions within any specific time. *Id.* Adverse decisions in redetermination hearings may be appealed to the Board of Immigration Appeals (BIA) by either the alien or the INS, though there is no time limit within which the BIA must render its decision. *Id.*

With this framework in mind, we turn to the parties' arguments. Apparently relying on both *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), Flores argued in the district court that the INS was constitutionally required to provide "prompt, mandatory, neutral and detached" review to each class member following arrest of (1) whether probable cause to arrest existed, (2) whether imposition of the release or bond condition was necessary to ensure future appearance, and (3) whether any suitable adult was available to whom the juvenile could be released. Flores also challenged the INS's alleged failure to provide prompt written notice to released juveniles of the bond conditions which had been imposed.

In granting summary judgment to Flores, the district court, with virtually no explanation of its reasons, ordered the INS to do the following:

1. Defendants ... shall release any minor otherwise eligible for release on bond or recognizance to his parents, guardian, custodian, conservator, or other responsible adult party. Prior to any such release, the defendants may require from such persons a written promise to bring such minor before the appropriate officer or court when requested by the INS.

2. Whenever a minor is released as aforesaid, the minor shall be promptly advised in writing in a language he understands of any restrictions imposed upon his release.

3. Any minor taken into custody shall be forthwith afforded an administrative hearing to determine probable cause for his arrest and the need for any restrictions placed upon his release. Such hearing shall be held with or without a request by or on behalf of the minor.

Paragraph 1 of the order was premised on the district court's determination that the INS's regulation violated substantive due process. In the preceding section, we explained our reasons for reversing that part of the order. The relief granted by paragraph 2 is inextricably linked to the relief granted by paragraph 1. Paragraph 2 requires the INS to provide notice of the bond conditions imposed under its regulation, but apparently only to those who would be *released* pursuant to district court's modification of the regulation.

Paragraph 3 requires an "administrative hearing" which must occur "forthwith." It is not entirely clear whether this administrative hearing is to occur before an IJ ("special examining officer"), or instead may be conducted before a second immigration officer. We assume that the district judge intended the former. The record supports this interpretation. Moreover, the alternative interpretation would deprive the injunction of much practical effect, since at least those aliens who are arrested *without* a warrant already are entitled to have probable cause reviewed by a second immigration officer "without unnecessary delay." *See* 8 U.S.C. § 1357(a)(2). The purpose of the hearing ordered by the district court is to determine (1) probable cause for the juvenile's arrest and (2) the need for any restrictions placed upon the juvenile's release. Finally, paragraph 3 apparently mandates an administrative hearing in every case. That is, the hearings are automatic, need not be requested, and perhaps cannot be waived. Paragraph 3 appears to be based on *Gerstein.*

In *Gerstein,* the Supreme Court held that the fourth amendment requires review, by a neutral and detached magistrate, of probable cause for arrest prior to any "extended restraint of liberty following arrest." 420 U.S. at 114, 95 S.Ct. at 863. The district court apparently as-

sumed that *Gerstein* applies to civil deportation proceedings. The court may have believed that the INS examining officer was not "neutral and detached" under *Gerstein.* The rationale would seem to be that because both the INS officers who arrest the aliens and those who make a determination as to whether there is *prima facie* evidence that will allow the INS to detain the alien are law enforcement officials, they are incapable of being neutral or impartial. The INS responds that (1) the role of INS officers is equivalent to a committing magistrate's role, and (2) the requirement of prima facie evidence is more stringent than probable cause.

We need not resolve this dispute since we conclude that *Gerstein* does not apply to deportation proceedings. The precise issue in *Gerstein* was "whether a person arrested and held for *trial* under a prosecutor's information is constitutionally entitled to a judicial determination of probable cause for *pretrial* restraint of liberty." 420 U.S. at 105, 95 S.Ct. at 858 (emphasis added). The Court in *Gerstein* itself stressed that its holding was not readily transferable to civil proceedings. *See id.* at 125 n. 27, 95 S.Ct. at 869 n. 27 ("The Fourth Amendment was tailored explicitly for the criminal justice system.... Moreover, the Fourth Amendment probable cause determination is in fact only the *first* stage of an elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct. The relatively simple civil procedures ... presented in ... [Justice Stewart's] concurring opinion are inapposite and irrelevant in the wholly different context of the criminal justice system.") (emphasis in original).

It is true that in *Schall* the Court cited *Gerstein* numerous times in upholding pretrial detention of juveniles in civil proceedings under a New York statute. *Schall,* 467 U.S. at 264, 274–77 & nn. 27–28, 104 S.Ct. at 2515–16 & nn. 27–28. The Court never declared, however, that *Gerstein's* standards directly applied to civil juvenile proceedings. Instead, the Court's discussion recognized that *Gerstein* had arisen in a different context. *See id.* 467 U.S. at 274–75, 104 S.Ct. at 2415 (recognizing that

*Gerstein's* holding applied to *adults* ); *see also id.* at 275 ("*Gerstein* arose under the Fourth Amendment, but the same concern with 'flexibility' and 'informality,' while yet ensuring adequate predetention procedures, is present in this case."). Thus, in *Schall,* the Court merely held that the New York statute "provide[d] far more predetention protection for juveniles than we found to be constitutionally required for a probable-cause determination for adults in *Gerstein.*" *Id.* 467 U.S. at 275, 104 S.Ct. at 2415. As we read *Schall,* it did not hold that *Gerstein* applied to civil proceedings.

The Supreme Court's decision in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (*Salerno* ), is also inapposite. In *Salerno,* an adult criminal detainee challenged on constitutional grounds a provision of the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.,* permitting dangerous felons to be detained before trial without bail. *See* 18 U.S.C. § 3142. The Court's procedural due process analysis in *Salerno* was geared toward the rights of adult citizens facing detention in the criminal context. *See Salerno,* 481 U.S. at 747–52, 107 S.Ct. at 2101–04. The situation before us in this case involves the rights of juvenile aliens facing detention in the civil context. For reasons discussed above, the quantum and type of due process protection afforded alien minors in civil deportation proceedings is different from that afforded adult criminals. We therefore do not need to follow the procedural due process analysis used by the Court in *Salerno* in order to decide this case.

Nor is it unusual that deportation proceedings, which by nature are not only "purely civil" but also a unique *kind* of civil proceeding, would feature fewer procedural due process protections than a criminal trial. *See INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) (exclusionary rule does not apply in deportation hearings). Other examples of criminal trial protections that do not apply in deportation proceedings include the quantum of proof, the need of *Miranda* warnings before a volun-

tary statement is given by the respondent, the *ex post facto* clause; and the inadmissibility of involuntary confessions. *Id.* 468 U.S. at 1039, 104 S.Ct. at 3483. Because deportation proceedings are civil, "the full panoply of due process rights [are] not applicable...." *Jean,* 727 F.2d at 974.

We are unpersuaded by several cases that have either assumed, without analysis, that *Gerstein* applies to INS probable cause determinations, or have drawn analogies between INS officers on the one hand and committing magistrates in a criminal context on the other. For example, in *Min–Shey Hung v. United States,* 617 F.2d 201, 202 (10th Cir.1980), the court examined the identical procedure that is at issue here, and found it sufficient to meet constitutional standards. The court likened the District Director's decision to a magistrate's. The decision

> is basically the same as a criminal proceeding before a magistrate on probable cause. Probable cause was thus also determined by the District Director. This, in our view, was sufficient to meet the constitutional standards and to commence the deportation proceedings. Probable cause for the arrest was so determined.

*Id.* At the same time, however, the court, in citing *Gerstein,* acknowledged that it had focused on "Florida criminal procedures," and therefore articulated a "standard applicable to a state." *Id.; see also Arias v. Rogers,* 676 F.2d 1139, 1142 (7th Cir.1982) (erroneously concluding that examining officer mentioned in 8 U.S.C. § 1357(a)(2) was IJ rather than INS official, and analogizing immigration judge to "committing magistrate in criminal proceeding"). We conclude that *Gerstein's* "neutral and detached" magistrate requirement is inapplicable to deportation proceedings.

Our holding is in keeping with the Supreme Court's forceful dicta in *Abel v. United States,* 362 U.S. 217, 230–34, 80 S.Ct. 683, 692–95, 4 L.Ed.2d 668 (1960). In *Abel,* though professing not to reach the issue of whether an INS arrest warrant was invalid because it failed to comply with the fourth amendment's requirements for warrants, the Court nonetheless devoted five pages to rejecting petitioner's claim. *See, e.g., id.* at 233, 80 S.Ct. at 694 ("[T]here remains overwhelming historical legislative recognition of the propriety of administrative arrest for deportable aliens such as petitioner."); *see also Jean,* 727 F.2d at 974 n. 24; *Spinella v. Esperdy,* 188 F.Supp. 535, 540–41 (S.D.N.Y.1960).

The district court based its ruling largely on *Gerstein.* It did not explicitly test the INS procedures incident to detention decisions by balancing the three factors outlined in *Mathews. Mathews* instructs that a court should weigh: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value of additional or substitute safeguards; and (3) the governmental interest, which includes the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. 424 U.S. at 334–35, 96 S.Ct. at 902. The *Mathews* test is the general test for procedural due process and is applicable to INS procedures such as those involved in this case. *See Landon v. Plasencia,* 459 U.S. 21, 36–37, 103 S.Ct. 321, 331–32, 74 L.Ed.2d 21 (1982).

We will not undertake the *Mathews* balancing in the first instance. The parties have not briefed this issue in detail. *See id.* 459 U.S. at 36–37 & n. 9, 103 S.Ct. at 331 & n. 9 (declining to consider whether exclusion hearing afforded permanent resident alien returning from 2–day trip abroad met *Mathews* standard since parties devoted attention to other issues on appeal and "[p]recisely what procedures are due ... has not been adequately developed by the briefs or argument"). Moreover, the district court should have the first opportunity to reconsider in light of our invalidation of paragraph 1 of the order. We therefore remand this issue to the district court, where the parties will have a fuller opportunity to explore the issue.

REVERSED AND REMANDED.

FLETCHER, Circuit Judge, dissenting:

I respectfully dissent. As Chief Justice Rehnquist observed, "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 2105, 95 L.Ed.2d 697 (1987). The majority goes to great lengths to deny liberty to children whose only possible offense is their alienage.

The facts of this case are among the most disturbing I have confronted in my years on the court. Children are being held in detention by the INS for as long as two years in highly inappropriate conditions out of a professed concern for their welfare. When the case first came before the district court, the only requirement for institutionalizing a child was a determination by an INS agent—not a judge—that there was prima facie evidence of the child's deportability. Upon such a slender showing, children were put into "detention centers" for indeterminate periods of time, deprived of education, recreation, and visitation, commingled with adults of both sexes and subjected to strip searches with no showing of cause. In the INS's Western Region, a child could escape such confinement only if a parent or legal guardian, or "in unusual and extraordinary cases" a responsible adult, came forward to seek release. The rationale for this regulation was to assure the "minor's welfare and safety" and to protect the agency from legal liability.

Only after suit was brought against it did the INS agree to modify the conditions of confinement and the treatment of the children during detention. The district court approved a partial settlement whereby the INS agreed to provide education, reasonable visitation rights, and recreation as well as to cease commingling detained minors with unrelated adult prisoners. Subsequently, without agreement of the INS, the court ordered the INS to cease strip searching the children unless it had reasonable suspicion to believe they were concealing weapons or contraband. The INS has not appealed that order.

In light of the INS's announced intention to promulgate new rules governing minors' pre-hearing release, the district court agreed to postpone ordering the agency in the Western Region to release children awaiting their deportation hearing to responsible adults (although that was the practice followed by the INS in other regions of the country and was the nationwide policy regarding children held for exclusion hearings). The INS's final regulations, however, allowed release to responsible adults other than parents, legal guardians, and adult relatives only in "unusual and compelling circumstances" and did nothing to provide for neutral and detached evaluation of the basis for determining the likelihood that the detained minors were deportable.

The district court concluded that the final regulations did not satisfy minimum due process requirements. Judge Kelleher entered an order requiring the INS (1) to release minors otherwise eligible for release to their parents, guardian, custodian, conservator, or other responsible adult party, (2) to advise those released promptly in writing of the conditions of their release, and (3) to hold a prompt administrative hearing to determine probable cause for their arrest and the need for any restrictions to be placed upon their release. This was a simple, sensible, minimally intrusive direction to the agency. I would uphold it rather than search for ways to reverse.

The result the majority reaches is deeply troubling. Equally troubling, however, are the analytic framework and standard of review adopted by the majority; they will reverberate well beyond the issues presented in this particular case.

I

The majority opinion rests its holding on Congress' plenary power over matters of immigration and naturalization and on the broad discretion Congress has delegated to the Attorney General and the INS to carry out its decisions to admit or exclude certain groups of persons. I agree with the majority that the INS has broad authority and discretion.

I also agree with the majority's rejection of the appellees' statutory argument that Congress limited the agency to promulgating regulations that would insure the appearance of minors at their upcoming deportation hearings. This, however, disposes only of appellees' claim that the INS exceeded the scope of its statutory authority.

The INS's discretion also is limited by the Constitution. Despite Congress' broad powers in matters of immigration, the Constitution extends certain protections to all persons within the jurisdiction of the United States. For instance, the protections of the Fifth and Fourteenth Amendments extend to aliens physically present in the United States. *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1975) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law."); *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Baires v. INS*, 856 F.2d 89, 90 (9th Cir. 1988). Nor are appellees ineligible for constitutional protection because of their youth. *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Despite these clear holdings and despite the fact that laws that adversely treat aliens or that infringe on a basic constitutional right warrant heightened scrutiny, the majority nevertheless concludes that the INS's regulations are largely beyond judicial review. In arriving at its conclusions, the majority makes two errors in its constitutional analysis.

#### A.

First, the majority misinterprets the scope and overlooks the source of the executive and legislative branches' discretion. After establishing that the subject matter of the challenged regulations (the manner of detention of suspected illegal aliens) is not outside the scope of the INS's statutory authority, a proposition with which I fully agree, the majority proceeds to discuss another subject entirely, Congress' broad authority to determine who should be allowed to enter and remain in the country. The opinion then moves from the discussion of Congress' unfettered power to decide *whom to admit* to the United States to the conclusion that since the due process clause does not constrain congressional power to determine who may enter, this somehow determines the due process rights of individuals present in the United States awaiting deportation proceedings and constrains judicial review of claimed violations of their due process rights and conditions of confinement.

In effect, the majority is moving from the uncontroverted propositions that the political branches have plenary authority over deciding whom to admit into the country and that such political decisions are largely immune from judicial review, to the unsupportable conclusion that how it treats those whom it detains while the deportation process is underway is likewise beyond judicial review. This is an unwarranted leap.

The majority exhaustively reviews the relevant statutes, legislative history, and case law to establish the general proposition that the legislative and executive branches have virtually unbridled authority over matters of immigration and naturalization. While it is true that the political branches have virtually unreviewable authority to decide whom to admit into the United States and whom to exclude, this does not mean they can do just anything to an individual while his status is under review. A decision by the political branches to admit more Nigerians than Irish into the United States may not be vulnerable to an Equal Protection challenge. But a decision to incarcerate all Nigerians awaiting deportation hearings but not Irish would be accorded no such judicial deference. The courts' deference to the "plenary power" of Congress is limited essentially to Congress's decision regarding *who* is excludable; it does not extend to their treatment during the deportation process. The very Supreme Court cases upon which the ma-

jority relies makes this clear. *See, e.g., Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1976) (upholding law granting preferential immigration status to natural mothers but not natural fathers of children born outside of marriage); *Harisiades v. Shaughnessy,* 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (upholding Alien Registration Act of 1940, which authorized deportation of aliens because of their membership in the Communist Party); *Galvan v. Press,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (upholding Internal Security Act of 1950 which provided for the deportation of legally resident aliens because they had once been members of the Communist Party even though unaware of the party's advocacy of violent overthrow of the government). The cases the majority cites in which the Supreme Court recognized that "Congress regularly makes rules that would be unacceptable if applied to citizens," likewise refer to legislative decisions regarding which aliens to exclude from the country. For instance, in *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) the Supreme Court affirmed the Attorney General's denial of a visa for a Marxist alien scholar even though such action would violate the First Amendment if applied to a U.S. citizen.

The respective roles of the three branches is readily understandable once one recognizes that congressional and executive authority over immigration stems from the allocation within our scheme of separation of powers and federalism, to the national political branches of all authority over foreign relations and national security. This both limits and justifies congressional and executive authority. The reason for the substantial deference that the judiciary owes to the other two branches in these areas has been recognized time and again by the Supreme Court. In *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1975), the Court observed that the political branches of the federal government are responsible for our rela-

tions with foreign powers and cautioned that constitutional law must not unnecessarily inhibit the flexibility of the political branches to respond to changing political and economic global conditions. The *Diaz* Court relied on the reasoning of a 1952 case, *Harisiades v. Shaughnessy,* 342 U.S. 580, 72 S.Ct. 512, in which the Court noted that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 588–89, 72 S.Ct. at 518–19. Similarly, in *Galven,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1953), the Court deferred to the broad power of Congress over sovereignty, foreign relations, and national security.

The majority quotes these cases and others to support its view that the judiciary must defer to the INS in all matters: "Because Congress's power over immigration is plenary and political in nature, the exercise of that power is subject ' "only to narrow judicial review." ' " (Maj.Op. at 1004). What the majority glosses over, however, is that those cases limit the INS's claim to deference to those areas that affect our country's relations with foreign powers or our national security.[1]

The majority suggests without quite saying it that Congress wished to give and the courts have allowed the INS virtually unreviewable discretion to hold arrested aliens in custody prior to their deportation hearings. The majority quotes extensively from Congressional committee reports of the Hobbs Bill, a defeated precursor to the 1950 Subversive Activities Control Act (of which the present § 1252 is a derivative of a derivative). The majority highlights those sections that express Congressional intent to grant the Attorney General "untrammeled authority" to impose conditions of release (such as requiring aliens to make

---

1. As one commentator notes, "even the federal government cannot make free use of alienage classifications which do not relate to foreign

policy." Rotunda, Nowak, and Young, *Treatise on Constitutional Law: Substance and Procedure,* § 18.12, at 494.

periodic reports as to their location or to post more bond money) pending final determination of deportability. I question whether this statement, made in the 1950's, regarding discretion to impose conditions on those aliens released on bond is a useful aid to judicial interpretation of the effect of the current immigration act on the INS's discretion to refuse to release aliens under any condition. Even if it were, such legislative history that would infuse a statute with an unconstitutional cast should be read suspiciously and narrowly. *See United States v. Witkovich,* 353 U.S. 194, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957) (rejecting a literal reading of a provision of the Immigration and Nationality Act of 1952 where such a broad interpretation of the discretion granted the Attorney General would generate constitutional doubts as to the validity of the statute).

The majority also relies heavily on *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), in which the Court, in reviewing the bond provisions of the Subversive Activities Control Act, agreed with the government that "Congress' intention [was] to make the Attorney General's exercise of discretion presumptively correct and unassailable except for abuse." *Carlson* cannot be read as the majority suggests as conferring upon the INS unfettered authority over pre-hearing detention of aliens. The purpose of the Subversive Activities Control Act was to deport all alien Communists as a menace to the security of the United States. *Carlson* involved a challenge to the Attorney General's decision to hold aliens who were active Communists without bail pending determination of their deportability. The Attorney General justified the exercise of discretion to deny bail "by reference to the legislative scheme to eradicate the evils of Communist activity." *Id.* at 543, 72 S.Ct. at 536. The Supreme Court upheld the pre-hearing detention out of deference to the Attorney General's national security authority: "As all alien Communists are deportable, like Anarchists, because of Congress' understanding of their attitude toward the use of force and violence in such a constitutional democracy as ours to accomplish their political aims,

evidence of membership plus personal activity in supporting and extending the Party's philosophy concerning violence gives adequate grounds for detention." *Id.* at 541, 72 S.Ct. at 535. *Carlson* merely upheld the INS's detention of those individuals who pose a threat to the community or who are a "menace to the public interest." *Id.* at 541, 72 S.Ct. at 534. Where the Supreme Court subsequently has cited *Carlson,* it has given it a narrow interpretation. *United States v. Salerno,* 481 U.S. 739, 748, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (*Carlson* cited for proposition that there is "no absolute constitutional barrier to detention of potentially dangerous resident aliens pending deportation proceedings."); *INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1983) (*Carlson* cited for proposition that the Eighth Amendment does not require bail to be granted in "certain" deportation cases). The majority's reliance on *United States Ex Rel. Barbour v. District Dir. of INS,* 491 F.2d 573 (5th Cir.1974) is likewise misplaced as that case also addressed the INS's authority to detain an alien believed to pose a risk to national security. (The Syrian government had notified U.S. authorities of petitioner's true identity as an officer of the Syrian Army accused of smuggling money.)

Where the INS acts outside this realm—as it does when it determines how the people whom Congress has decided will not be admitted into the United States are to be treated while they await deportation determinations as well as when it purports to act in the interest of alien children—the INS has no special claim to deference beyond that which we accord any other agency. Although protecting the children's welfare may be a statutorily permissible interest, the agency is entitled to no special deference in this area. Recent Supreme Court cases are in accord. Although reaffirming the political branches' virtually unreviewable authority over decisions as to which groups to exclude and whom to deport, the Court has struck down laws that imposed discriminatorily adverse conditions or treatment of aliens while present in our country.

In *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) the Court found that the Civil Service Commission regulation barring noncitizens from civil service employment unconstitutionally deprived resident aliens of liberty without due process in violation of the Fifth Amendment. The Court explicitly rejected the government's "primary submission that the federal power over aliens is so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens." Similarly, in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, in striking down a state law withholding funds for the education of illegal alien children, the Court analyzed the degree of deference due this state law by contrasting it to the deference accorded federal legislative decisions which is derived from Congress' plenary authority over foreign relations and international commerce, and upon the inherent power of a sovereign to close its borders. The Court noted that the "obvious need for delicate policy judgments has counseled the Judicial Branch to avoid intrusion into this field." The regulations at issue in this case present no delicate foreign policy issues. They do not impinge in any way on decisions as to which groups of people to admit or exclude from the country. Nor is there any claim made that these children pose a risk to our national security. The INS regulations at issue command no special deference.

### B.

On the contrary, the agency's regulations should be more *closely* reviewed because they deprive a group traditionally subject to discrimination of their physical liberty; a quasi-suspect class is being deprived of a basic constitutional right. Either factor is sufficient to trigger heightened judicial scrutiny. Both are present here. The majority nonetheless insists we should apply a deferential standard of review. This second error also is critical. Perhaps less so to the outcome of this

case—since the regulations could not pass even a rational relation test—than to the integrity of constitutional analysis.

I disagree profoundly with majority's characterization of the constitutional right at stake. The majority, starting from the premise that in substantive due process analysis, the right at stake must be defined narrowly, then defines the right claimed by appellees as "the right of alien juveniles in deportation proceedings to be released to unrelated adults." (Maj.Op. at 1007). The majority, unable to locate this phrase in the constitution or precedent, then reasons that there is no fundamental constitutional right implicated and that the regulations are subject to only minimal scrutiny. This analysis is, very simply, wrong.[2] The Constitution is not a civil code. Constitutional rights are not characterized at that level of specificity. To define the right as the majority does defines it out of existence. For its approach to constitutional analysis—which would apply in Equal Protection Clause analysis as well—the majority relies on two cases. It cites *Christy v. Hodel*, 857 F.2d 1324 (9th Cir.1988), for the proposition that the right at stake must be defined narrowly for the purposes of substantive due process analysis. What the court said was that strict judicial scrutiny of legislation is reserved for enactments that "impinge upon constitutionally protected rights." (quoting *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973)). *Christy* involved an alleged taking of property by an Interior Department Endangered Species Act regulation that prohibited the killing of grizzly bears. Plaintiffs alleged this deprived them of their constitutional right to defend their sheep. The District Court granted summary judgment for the government. Despite a well developed body of caselaw that guides the analysis of takings claims under the fifth amendment, the court analyzed the case as requiring the court to determine first whether the plaintiffs were alleging a "funda-

---

**2.** Elsewhere, the majority concludes that there is no "substantive due process right not to be deported." This exemplifies the use of a straw person to obfuscate the real issue. This case is not about deportation; it is about pre-hearing detention.

mental right." The plaintiffs urged that, since the Supreme Court had inferred a constitutional right to privacy despite the absence of express language in the constitution, this court should recognize a constitutional right to kill federally protected wildlife in defense of one's property. The court understandably declined to do so.

*Christy* should be read simply as a refusal to find that the fifth amendment protection of property rights embraces the right to be exempt from laws protecting endangered species. To the extent *Christy* is read as standing for a general proposition that rights must be defined narrowly in substantive due process cases, it is inconsistent with Supreme Court precedent. In *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1957) the Court did not consider whether there is a fundamental right against "forced disclosure of membership lists." Rather it analyzed the impact of state law on the fundamental right to "association." In *New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the Supreme Court considered the impact of the government's action, not on the newspapers' right to publish a classified study on the United States policy-making in Viet Nam, but on the newspapers' right of freedom of the press. In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, the Court did not examine whether there is a fundamental right to educate one's children at home once they have completed the eighth grade; it analyzed whether the state compulsory education law violated the right to free exercise of religion.

In the second case cited to support the majority's assertion that rights must be narrowly defined, *Almario v. Attorney General*, 872 F.2d 147 (6th Cir.1989), the sixth circuit rejected plaintiffs' argument that the Immigration Marriage Fraud Act violates due process by unreasonably burdening the fundamental right to marry. The opinion does state that the constitution does not recognize the right of a citizen spouse to have his or her alien spouse

remain in this country. However, the court merely was restating the holdings of previous cases, which concluded that the deportation of alien spouses did not unconstitutionally interfere with the right to marry, a right which the court recognized was fundamental. Finding that a constitutional right is not *violated* by a particular government action is quite different from denying the existence of the right.

Recent debates over which rights are "fundamental" have occurred in the context of deciding whether *unenumerated* rights—those rights not readily identifiable in the text of the Constitution or its amendments—such as the right to privacy, to association, to vote, or to obtain education, should qualify as fundamental.[3] The analysis the majority has employed to define the right is suitable when the issue facing the court is whether an activity that is at the periphery of an already recognized right should be included in that category. *See e.g., Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780 (does first amendment right to free speech include the right to wear a jacket with obscenities emblazoned on it); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (does right to free speech include right to make campaign expenditures); *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1981) (does liberty interest of institutionalized persons extend to training and habilitation necessary to ensure bodily safety and a minimum of physical restraint). It is obvious that this case requires neither type of analysis.

The majority also relies on *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) to support its characterization of appellees' right. *Hardwick* simply has no applicability to this case. In *Hardwick*, the Court advised against expanding the list of fundamental rights which have attenuated roots in the language or design of the Constitution and the Court refused to acknowledge that engaging in "homosexual sodomy" was included

---

**3.** The Court originally considered which individual rights are considered fundamental when it undertook the task of "selective incorporation" or making applicable to the states certain provisions of the Bill of Rights.

in the right to privacy. Although there may be disagreement over the far reaches of "liberty," there can be no dispute that its source is the text of the Constitution, that its core reference is to freedom from physical restraint, and that the interest is fundamental. This is apparent from all the decisions that have addressed substantive and procedural due process challenges to government's incarcerating or institutionalizing persons.

As the Supreme Court stated in *United States v. Salerno*, 481 U.S. 739, 751, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987), although the government has a strong interest in protecting the community from allegedly dangerous criminals, it must be balanced against "the individual's strong interest in liberty. We do not minimize the importance and fundamental nature of this right." *See also, DeShaney v. Winnebago County DSS*, 489 U.S. 189, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989) ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause ..."); and *Ingraham v. Wright*, 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) (the "liberty interest ... [has] always ... been thought to encompass freedom from bodily restraint.") [4]

---

**4.** The majority relies on Justice Scalia's concurring opinion in *Cruzan v. Director, Missouri Department of Health*, — U.S. —, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) as support for its definition of the constitutional right at issue in this appeal. The majority's reliance on the concurrence is surprising since all but Justice Scalia acknowledged that there are substantive limits on the ability of the state to infringe upon an individual's right to liberty. Additionally, *Cruzan* like *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) is a case that required the Court to further define the outer boundary of a recognized constitutional right, i.e. does the right to liberty encompass the "right to die?" It cannot seriously be argued that the right to liberty does not encompass the right to physical liberty.

Justice Scalia, in contrast to the other eight Justices, resisted finding a substantive due process right implicated and declined to agree that "due process" includes substantive limits. The majority quotes Justice Scalia: "[t]he text of the Due Process Clause does not protect individuals against deprivations of liberty *simpliciter*." *Cruzan* 110 S.Ct. at 2859. Yet a few lines after the passage quoted by the majority, Justice Scalia explains that he need not resolve whether the due process clause imposes substantive limitations on government action because "no substantive due process claim can be maintained unless the claimant demonstrates that the State has deprived him of a right historically and traditionally protected against State interference." *Id.* 110 S.Ct. at 2859–60. Justice Scalia traces the history of the law regulating suicide and concludes that traditional Anglo–American law accorded it no protection. Even assuming the validity of Justice Scalia's analysis, it provides no support for the majority's position in the present case: an examination of the history of Anglo–American law would uncover a traditional definition of liberty that at the minimum encompassed physical liberty. As Justice Cardozo wrote, "Bills of rights give assurance to the individual of the preservation of liberty. They do not define the liberty they promise. In the beginnings of constitutional government, the freedom that was uppermost in the minds of men was freedom of the body.... There went along with this, or grew from it, a conception of a liberty that was broader than the physical." B.N. Cardozo, "Paradoxes of Legal Science," in *Selected Writings of Benjamin Nathan Cardozo*, 311 (M.E. Hall ed. 1947).

The majority observes that the right to liberty is not a "free-floating fundamental substantive due process right." *Flores*, at 1007 n. 3. I agree. The Constitution does not forbid the detention of either adults or children. But it is axiomatic that the Constitution places a heavy burden upon the state to establish that deprivation of an individual's physical liberty is necessary. Traditionally this burden must be met by a showing of such things as the fact that the person committed a crime or that he must be committed because he poses a danger to society or to himself—determinations accompanied by strict procedural safeguards which are conspicuously absent here. This constitutional tradition is precisely why the pretrial detention at issue in *Salerno*, 481 U.S. 739, 107 S.Ct. 2095, was so controversial. It also explains why, even though the *Salerno* Court may not have used the terminology of strict scrutiny, it exercised careful and searching review of the need for the government's pretrial detention system. (Ironically, one is reminded of *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) where the majority purportedly applied strict scrutiny, while the dissent, applying only a reasonable relation test, found the government's invocation of national security insufficient justification for detaining aliens and citizens of Japanese descent.)

The problem with the majority's opinion is that it assumes that the government may incar-

## · II

I would find that the challenged INS regulations unconstitutionally deprive detained alien minors of their liberty. The regulation's effect is to mandate continuous pre-hearing detention of alien minors if there is no relative or legal guardian readily at hand to whom they can be released. We should be guided therefore by cases that have analyzed laws mandating pretrial detention in other situations: *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) and *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984).[5] Although in both *Salerno* and *Schall* the Court upheld the challenged pretrial detention rules, both cases are instructive in the framework of analysis and a useful standard of comparison they provide. The striking differences between the facts of *Schall* and· *Salerno* and the facts here reveal that the INS's regulations do not lie on the permissible side of the boundary.

*Schall* involved a substantive and procedural due process challenge to a statute authorizing pretrial detention of minors found to pose a serious risk to the community. As the Court noted, although juvenile offenses are not crimes and proceedings against juvenile offenders are characterized as civil, some of the protections provided in the criminal context apply in such civil proceedings because restrictions are placed on juveniles adjudged delinquent. 467 U.S. at 257, n. 4, 104 S.Ct. at 2406, n. 4. The Court stated that a minor's interest in "freedom from institutional restraints" is "undoubtedly substantial," although qualified by the fact that children "are always in some form of custody." *Id.* at 265, 104 S.Ct. at 2410. Even though the minor's liberty interest is qualified, the Court will require a "legitimate and compelling state interest" to override it. *Id.* at 264, 104 S.Ct. at 2409. There are four governmental concerns that the Court has

cerate an individual unless he can establish the existence of an extraordinary reason why he should remain free. The history of our law teaches us otherwise: the state may not jail someone unless it can present an overriding justification for doing so. Or as Justice Cardozo wrote, "The subject was not to be tortured or imprisoned at the mere pleasure of the ruler." Cardozo at 311.

When the individuals detained have no representation in the political process, we have an added obligation to assure ourselves that the state is not acting improperly. There is a final irony in the majority's reliance on Justice Scalia's concurring opinion in *Cruzan*. Justice Scalia rhetorically asks what safeguard exists to prevent the State from passing oppressive laws such as imposing a tax of 100% on income above the subsistence level or requiring us to send our children to school for 10 hours a day. It is not, concludes Justice Scalia, the Due Process Clause. Instead, "[o]ur salvation is the Equal Protection Clause, which requires the democratic majority to accept for themselves and their loved ones what they impose on you and me." *Cruzan*, 110 S.Ct. at 2863. But who are the "loved ones" that the children imprisoned in INS detention camps can call upon to speak for them? Certainly not the politically powerful. Probably not even the enfranchised. The hardships the INS imposes in this case—even if they can be said to have the sanction of the democratic majority—fall on neither the majority nor their loved ones. Rather, they fall on a silent and isolated and helpless minority. Even if we were restricted to Justice Scalia's

narrow version of individual liberty, the children would prevail.

**5.** It is true that all procedural criminal protections do not apply in deportation hearings. This is because a deportation hearing is a purely civil matter designed to determine a person's eligibility to remain in this country and is "intended to provide a streamlined determination of eligibility to remain in this country, nothing more." *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984).

Once again, however, this appeal is not about deportation hearings. It is about placing people in physical custody while they await disposition of their status. Thus it more closely resembles criminal incarceration. Administrative warrants are issued for the aliens' arrest, searches are permitted incidental to the arrests, their physical liberty is taken away, and they may challenge the length of their custody by petitioning for writ of habeas corpus. As the Tenth Circuit has concluded, detention of aliens pending deportation is properly analogized to incarceration pending criminal trial. *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir.1981).

Significantly, in analyzing a federal pretrial detention statute in *Salerno*, 481 U.S. 739, 107 S.Ct. 2095, the Court relied on *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, which involved detention prior to *civil* proceedings. (The *Salerno* Court concluded that pretrial detention under the Bail Reform Act is regulatory, not penal.)

recognized as sufficient to override this liberty interest and to justify pretrial detention: (1) danger to the community if the individual were to be released; (2) risk of flight; (3) concern that the detainee might attempt to influence the tribunal illegitimately, for example, by intimidating witnesses or jurors; and (4) the need to protect a juvenile from the consequences of his criminal activity as well as to preserve and promote the welfare of the child. *Salerno*, 481 U.S. at 748–49, 107 S.Ct. at 2102; *Schall* 467 U.S. at 265–66, 104 S.Ct. at 2410–11. The government bears the burden of proving on an individualized basis that detention is required to serve these interests. The INS has not met its burden.

The stark contrast the INS regulations pose to the New York scheme upheld in *Schall* and the federal statute upheld in *Salerno* makes clear that the INS is acting well outside the realm found permissible by the Court. In *Schall* the New York statute authorized pretrial detention of accused juvenile delinquents based on a finding of a serious risk that the child would commit additional criminal acts before the return date. In upholding the law, the Court relied on the range of protections provided the juveniles. The child was guaranteed an individualized probable cause hearing to determine whether the child posed a risk to the community. There was a strictly limited period of pre-hearing detention and an expedited factfinding hearing. During their short stay (a *maximum* permissible detention of seventeen days for the most dangerous children and six days for less serious offenders) the children were subject to carefully regulated conditions of confinement providing for dormitory assignment based on age, size, and behavior, and they received counseling sessions, education and recreational programs. The protections upon which the Court relied to uphold pretrial detention in *Schall* are absent in *Flores*. The INS makes no attempt to expedite factfinding hearings, no time limits are imposed on the permissible period of detention. In fact, the INS admits it has no idea how long the children could be detained.

Other differences between *Schall* and the circumstances of this case further cut against the majority's position. First, the minors in question in *Schall* had been found to pose a danger to the community. If anything, the government has a *greater* interest in detaining juveniles accused of criminal activity than children it seeks only to deport; minors who are not even arguably a threat to the community should be subject to *fewer* restrictions on their physical liberty. Second, one of the explicit statutory purposes of the New York law was "to determine and pursue the needs and best interests of the child." *Id.* at 257, n. 4, 104 S.Ct. at 2406, n. 4. This justifies deference to the *parens patriae* role asserted by the government in a way that is markedly absent in the present case, where the explicit statutory purpose guiding the INS is to protect the national security and guide foreign relations.

The statute upheld in *Salerno*, 481 U.S. 739, 107 S.Ct. 2095, likewise is in sharp contrast to the regulations challenged here. The Court found the Bail Reform Act of 1984 constitutional because it was narrowly tailored to serve a compelling state interest. The Act requires courts prior to trial to detain arrestees charged with certain serious felonies if the government demonstrates by clear and convincing evidence after an adversary hearing that there is no other way to assure the appearance of the person at future proceedings or to protect the safety of the community. The *Salerno* Court emphasized the number of procedural safeguards provided the arrestee, including a "full-blown adversary hearing" in which the government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person, and the overwhelming nature of the government's interest in protecting the community from danger posed by those who have been arrested for violent and other particularly serious offenses. *Id.* at 750, 107 S.Ct. at 2103. Again, *Flores* stands in sharp contrast. The children do not pose a threat to the community. There are no comparable procedural protections.

Whatever the proper standard of review, the constitutionality of the INS's regulations must be assessed by evaluating the degree and nature of the harm imposed on the children against the nature of the government interest furthered by the regulations. To the extent the INS seeks to justify the regulation on the ground that they ensure the child's appearance at future hearings, that interest fails to justify the detention of the children. It is not even rational to suppose that the child will be more likely to return for his deportation hearing after being released to an irresponsible relative than if he is released to a responsible adult.[6]

The INS seeks to justify detaining the children primarily on the ground that they do so out of concern for the children's welfare. The INS's assertion that children's welfare is better served by remaining indefinitely in jail stretches credulity. Common sense as well as expert testimony tells us that keeping children in jail, even under "ideal" jail conditions simply is not a rational way for the government to fulfill its responsibilities as "surrogate parent."[7]

The inadequacy of the INS's justification is underscored by the fact that at the time the agency implemented these regulations out of its concern for the welfare of the children, it was incarcerating them in detention centers commingled with adults without providing them recreation, education, visitation by family or friends, and subjecting them to arbitrary strip searches. It was only as a result of this lawsuit that the agency modified its treatment of the detainees. So although the conditions have been ameliorated by the settlement decree and a court order, the genuineness of the INS concern is placed in some doubt. Certainly at the outset of this litigation, the INS's professed concern for the children's welfare was entirely undercut by the reality of the conditions under which it detained them. Appellees' claim of pretext is not without substance particularly in light of the evidence that undocumented parents who came to claim their children were swooped up immediately and deportation proceedings commenced against them. If the INS were using the children as bait to lure their parents, this would not only be insidious, it would be unconstitutional. "Even if the State found it expedient to control the conduct of adults by acting against their children, legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice." *Plyler v. Doe*, 457 U.S. at 220, 102 S.Ct. at 2396.[8]

6. According to appellees, this was an after-the-fact justification put forward by the agency.

7. Not surprisingly, experts advise that releasing children to any responsible adult is far preferable to jailing them, even under ideal conditions. *See* Institute of Judicial Administration/American Bar Association, Juvenile Justice Standards Relating to Interim Status: The Release, Control and Detention of Accused Juvenile Offenders Between Arrest and Disposition (1980) (Restraint on the freedom of accused juvenile generally is contrary to public policy. Exceptions recommended only in the case of a juvenile accused of violent crime or with a demonstrated record of flight or who pose a threat to community or himself. "Whenever an accused juvenile cannot be unconditionally released, conditional or supervised release that results in the least restrictive interference with the liberty of the juvenile should be favored over more intrusive alternatives.") *Id.* at §§ 3.4 and 6.6.

8. In its amendment at 1003, n. 2, the majority questions my skepticism over the INS's assertion that its policy of detaining children is justified by its pursuit of the children's best interests. The majority insists that it is rational to believe that indefinite detention of these children serves their welfare more than would releasing them to unrelated adults. The majority opinion raises the spectre of the INS releasing children to child abusers and sexual deviants. However, the INS presented no evidence that this was a risk. Indeed, in a brief filed after this appeal was submitted, amici, including the American Friends Service Committee, Lutheran Immigration and Refugee Service, the American Branch of the International Social Service and other organizations with expertise and experience assisting children and aliens, explained that in their experience it is church members, social workers, and parents with roots in the local community who are willing to take responsibility for the children. I agree that the INS must take precautions to determine that children are released to responsible and suitable adults. The majority accepts the INS's position that although it can afford to keep the children in custody, it does not have the resources to do the screening necessary to ensure their safety on release. I find this position incredible.

Even assuming that protecting children is a compelling government interest and that Congress has delegated the duty to the INS in this instance, the INS had many options that would be more narrowly tailored and less burdensome. The INS argues that it "is not a social welfare agency" and insists that it does not have the resources or the expertise to assess whether an adult other than a parent or legal guardian would be responsible enough to take custody of a detained minor. However, evaluating the fitness of other adults to take custody of detained minors would appear to be much less burdensome than incarcerating children at a cost of up to $100 per day and overseeing their welfare in an institutional setting. The administrative burden to the INS in evaluating the fitness of a given adult to take custody of a detained minor would be an insufficient reason to infringe upon children's fundamental constitutional rights. *See Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142, 150–52, 100 S.Ct. 1540, 1545–46, 64 L.Ed.2d 107 (1980) (administrative convenience and savings from imposing blanket eligibility rule rather than making individualized determination of dependency insufficient to justify discriminatory state law.) The INS admits that it never has been sued for having released a juvenile to someone other than a parent or legal guardian, nor is it aware of any case in which a minor released to an unrelated adult has been harmed or neglected. There is simply no evidence that the INS's regulations in fact protect children, are necessary to avoid liability or tend to insure their appearance at future proceedings.

## III

In response to appellees' argument that the INS should provide prompt, mandatory, neutral and detached review to every arrested minor, Judge Kelleher issued an injunction ordering the INS to provide all minors taken into custody an administrative hearing to determine probable cause for their arrest and the need to place any restrictions upon their release. The majority concludes that such procedural protec-

tions are not constitutionally required in civil deportation hearings. I disagree with this characterization of the issue. What is being challenged is the adequacy of procedures allowing pre-hearing detention following an administrative arrest. Determinations of who may remain in this country invoke entirely different concerns than does the treatment of those persons who are detained awaiting disposition of their immigration status. These INS procedures are more closely analogous to criminal proceedings.

As the Supreme Court repeatedly has instructed, the constitutional sufficiency of procedures must be determined with reference to the rights and interests at stake, and, of course, varies with the circumstances. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Supreme Court held that judicial determination of probable cause is a constitutionally required prerequisite to extended restraint of liberty following arrest. Recognizing the injury to an individual's family relationships and job as well as the other restraints on liberty, the Court reasoned that when "the stakes are this high," a determination by a neutral magistrate is required. Prosecutorial judgment standing alone is not enough. *Id.* at 114, 95 S.Ct. at 863. Children held under administrative arrest in detention prior to their deportation hearings require no less. Nonetheless, the majority concludes that *Gerstein* is inapplicable because the arrests at issue in *Gerstein* were pursuant to criminal law while deportation hearings are civil proceedings. The majority instead would remand the case to the district court for application of the *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) test. Although I believe that the outcome under the *Mathews* test will be no different than the conclusion compelled by *Gerstein*, remanding the question to the district court is neither necessary nor appropriate.

In evaluating the constitutionality of procedures provided by the government in any case, *Mathews v. Eldridge* directs courts to consider the interest at stake for the individual, the governmental interests in-

volved, and the value of additional procedural requirements. In essence, these are the factors the Court considered in deciding *Gerstein* the previous year. The Court concluded that an individual's interest in remaining free from incarceration is so great as to require the procedural protection of a neutral and detached magistrate. See also, *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (the liberty interest of a prisoner in not being classified as mentally ill and transferred to a mental hospital is substantial enough to warrant the procedural safeguard of an independent decisionmaker). Indeed, in *Schall v. Martin,* 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1983), the Court upheld New York laws governing the pretrial detention of juveniles explicitly in part because the procedural safeguards surpassed those required by *Gerstein.* The *Schall* Court's reliance on *Gerstein* is particularly significant in light of the fact that New York's juvenile detention proceedings are civil; the Court relied on both *Mathews* and *Gerstein* in evaluating the adequacy of procedures applied to determine juvenile detention.[9]

## CONCLUSION

We must remember that persons arrested by the INS are often entitled to and do remain in the United States. Some of the children arrested eventually will be found to be citizens or legal aliens, while others may be granted political asylum. Even if we were so unfeeling as to be unconcerned with the tragic effects on children who in the end will be returned to their home countries, at the least we ought to be alarmed at the effect on those who will remain. As the Supreme Court warned in *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382 " 'the illegal alien of today may well be the legal alien of tomorrow.' " Certainly, incarceration no less than denial of an education, will mean that these children " 'already disadvantaged as a result of poverty, lack of English-speaking ability, and undeniable racial prejudices, ... will become permanently locked into the lowest socioeconomic class.' " *Id.* at 208–09, 102 S.Ct. at 2390.

I would affirm the district court.

---

**9.** The majority disregards the Court's application of *Gerstein* to prehearing civil detention because, according to the majority, although the Court cited *Gerstein* numerous times, it "never declared, however, that *Gerstein's* standards directly applied to civil juvenile proceedings." This treatment of the Court's opinion is puzzling. The Court began its discussion of the sufficiency of the procedures afforded juveniles by stating that "In *Gerstein v. Pugh,* 420 U.S., at 114, [95 S.Ct., at 863], we held that a judicial determination of probable cause is a prerequisite to any extended restraint on the liberty of an adult accused of crime.... *Gerstein* arose under the Fourth Amendment, but the same concern with 'flexibility' and 'informality,' while yet ensuring adequate predetention procedures, is present in this context (citations omitted). In many respect, the FCA provides far more predetention protection for juveniles than we found to be constitutionally required for a probable-cause determination for adults in *Gerstein." Id.* 467 U.S. at 274–75, 104 S.Ct. at 2415. The Court went to on explicitly compare aspects of the New York law with those features found constitutionally adequate in *Gerstein.*

The majority instead prefers to rely on the "forceful dicta" of *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). In this 1959 spy case, the Supreme Court rejected a challenge to an arrest that was the product of the INS and the FBI working in concert. It is true that the Court deferred to the "overwhelming historical legislative recognition of the propriety of administrative arrest for deportable aliens." However, appellees do not challenge whether the INS may make administrative arrests; the issue is what protections must accompany those arrests.

The majority also relies on *Min–Shey Hung v. United States,* 617 F.2d 201 (10th Cir.1980), in which the tenth circuit held the INS procedures for arresting aliens to be sufficient to meet constitutional standards. The *Hung* court, however, did not explain how the INS's law enforcement officers decisions are "basically the same as a criminal proceeding before a magistrate on probable cause." 617 F.2d at 202. In any event, *Hung* did not present an issue of the adequacy of pre-hearing detention; the petitioner was released on bond within 24 hours.